744 So.2d 413 (1999)
Thomas H. PROVENZANO, Petitioner,
v.
Michael W. MOORE, Respondent.
No. 95973.
Supreme Court of Florida.
September 24, 1999.
Michael P. Reiter, Chief Assistant CCRC, and Mark S. Gruber, Assistant CCRC, Capital Collateral Regional Counsel Middle Region, Tampa, Florida; and Martin J. McClain, Special Assistant CCRC, Brooklyn, New York, for Petitioner.
Robert A. Butterworth, Attorney General, Richard B. Martell, Chief, Capital Appeals, and Carolyn M. Snurkowski, Assistant Deputy Attorney General, Tallahassee, Florida, Katherine V. Blanco and Carol M. Dittmar, Assistant Attorneys General, Tampa, Florida; and Louis A. Vargas, General Counsel and Susan A. Maher, Deputy General Counsel, Department of Corrections, Tallahassee, Florida, for Respondent.
PER CURIAM.
Thomas H. Provenzano, at a time when he was under warrant of death, filed a petition for writ of habeas corpus, a petition to invoke this Court's "all writs" jurisdiction, and a petition for extraordinary relief. In order to give this matter full consideration, this Court entered a stay of execution on July 8, 1999. This Court directed the circuit court to hold an evidentiary hearing regarding the functioning of the electric chair. Following that four-day hearing, the circuit court rendered findings of fact with respect to the functioning of the electric chair and concluded that the electric chair does not constitute cruel or unusual punishment. These findings *414 of fact are the subject of this appeal. We have jurisdiction pursuant to article V, sections 3(b)(1) and (9) of the Florida Constitution. For the reasons explained below, we affirm the circuit court's order.
During the evidentiary hearing on this matter, both parties presented several witnesses, including testimony from experts. Most of the testimony focused on alleged errors committed by the Department of Corrections (DOC) during recent executions, particularly the execution of Allen Lee Davis on July 8, 1999. At the conclusion of the hearing, the circuit court entered an order denying relief, wherein it made the following findings of fact:
(1) During the execution of Allen Lee Davis, the electric chair functioned as it was intended to function. Although the breakers and other components of the electrical circuitry are old, the electric circuitry is adequate to assure the proper functioning of the electric chair.
(2) The cycles of voltage and amperage applied in the execution of Allen Lee Davis did not deviate from the execution protocol which was previously approved by the Florida Supreme Court. The execution protocol merely states: "The automatic cycle begins with the programmed 2,300 volts, 9.5 amps, for 8 seconds ...." (emphasis added). The protocol does not state the voltage and amperage levels set forth therein are the precise voltage and amperage levels that must be administered to the inmate who is being executed.
The execution protocol does not take into account the varying levels of resistance created by each and every inmate. The resistance created by each executed inmate's body, or ohms, can be determined by dividing the number of volts administered by the number of amps administered. Since the level of resistance varies from inmate to inmate, these figures must necessarily vary. The variations in these figures do not violate the execution protocol.
(3) The death of Allen Lee Davis did not result from asphyxiation caused by the mouth strap.
(4) Allen Lee Davis did not suffer any conscious pain while being electrocuted in Florida's electric chair. Rather, he suffered instantaneous and painless death once the current was applied to him.
(5) The nose bleed incurred by Allen Lee Davis began before the electrical current was applied to him, and was not caused whatsoever by the application of electrical current to Davis. This Court is unable to make a finding regarding the exact cause or situs of the initial onset of the nose bleed because that information was not determined during either of the autopsies performed on Davis' body.
(6) The post-execution photographs of Allen Lee Davis indicate that the straps used to restrain Davis' body, specifically, the mouth strap and chin strap, may have caused Davis to suffer some discomfort. However, the straps did not cause him to suffer unnecessary and wanton pain, and the mouth strap was not a part of the electrical operation of the electric chair.
(7) The use of a mouth strap to secure an inmate's head to the electric chair may be desirable, however a smaller and/or redesigned mouth strap could accomplish the same purpose without raising the same issue involved here.
(8) Execution inherently involves fear, and it may involve some degree of pain. That pain may include pain associated with affixing straps around the head and body to secure the head and body [to] the electric chair. However, any pain associated therewith is necessary to ensure that the integrity of the execution process is maintained.
The circuit court also made the following conclusion of law:
Execution by electrocution in Florida's electric chair as it exists in its present condition as applied does not constitute *415 cruel or unusual punishment, and therefore, is not unconstitutional.
Provenzano raises four arguments regarding the circuit court's order. First, Provenzano asserts that the circuit court erred in concluding that the electric chair did not constitute cruel or unusual punishment. Provenzano alleges three different bases for this conclusion: (1) the electric chair causes pain, both in preparing for and during the electrocution, (2) the electrical circuitry has not been maintained, and (3) DOC has failed to follow protocol.
This Court recently concluded in Jones v. State, 701 So.2d 76, 79 (Fla.1997), that "[i]n order for a punishment to constitute cruel or unusual punishment, it must involve `torture or a lingering death' or the infliction of `unnecessary and wanton pain.'" (citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947)). The record in this case reveals abundant evidence that execution by electrocution renders an inmate instantaneously unconscious, thereby making it impossible to feel pain. The record also contains evidence that the electric chair is and has been functioning properly and that the electrical circuitry is being maintained.
In Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997) (quoting Jones v. State, 591 So.2d 911, 916 (Fla.1991)), this Court stated, "As long as the trial court's findings are supported by competent substantial evidence, `this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" We find that the circuit court's findings of fact are supported by competent, substantial evidence. Therefore, we again conclude, as we did in Jones, that Florida's electric chair is not cruel or unusual punishment.
We are aware that the record contains numerous references from witnesses, including State witnesses, that the execution protocol is not well written. There is also a recommendation from the circuit court for DOC to employ "a smaller and/or redesigned mouth strap." We conclude that there is competent, substantial evidence to support the circuit court's finding of fact that the execution protocol was not violated in the Davis execution. However, it may be appropriate for DOC to revisit the protocol, including the use of the mouth strap, to ensure that it is consistent with the functioning of the electric chair.
In issue two, Provenzano claims that Florida's current use of electrocution as its sole method of execution is unconstitutional because it violates the evolving standards of decency that mark the progress of a maturing society. This claim was rejected by this Court in Jones. See 701 So.2d at 79.
In issue three, Provenzano claims that the circuit court made numerous erroneous evidentiary rulings during the evidentiary hearing,[1] thereby denying him a full and fair hearing. In Heath v. State, 648 So.2d 660, 664 (Fla.1994), this Court stated that "[t]he trial court has broad discretion in determining the relevance of evidence and such determination will not be disturbed absent an abuse of discretion." Provenzano has not demonstrated that the circuit court abused its discretion on these evidentiary rulings.
In issue four, Provenzano claims that the circuit court erred when it struck additional petitioners from Provenzano's petition for relief in this case. We find no merit to this issue. The order in this case directing the circuit court to hold an evidentiary hearing was specific as to the parties in this case. Further, a similar *416 motion to intervene was denied by this Court in Jones v. State, No. 90,231 (order filed July 3, 1997).
Accordingly, for the reasons expressed in this opinion, we affirm the circuit court's order finding that the electric chair is not unconstitutional. No motion for rehearing will be permitted.
It is so ordered.
HARDING, C.J., and WELLS, LEWIS, and QUINCE, JJ., concur.
HARDING, C.J., concurs specially with an opinion, in which LEWIS, J., concurs.
WELLS, J., concurs with an opinion, in which QUINCE, J., concurs.
QUINCE, J., concurs specially with an opinion, in which WELLS, J., concurs.
SHAW, J., dissents with an opinion, in which ANSTEAD, J., concurs.
ANSTEAD, J., dissents with an opinion, in which SHAW, J., concurs.
PARIENTE, J., dissents with an opinion, in which ANSTEAD, J., concurs.
HARDING, C.J., specially concurring.
I write separately for two reasons. First, I write to explain the reasons that I concur with the majority opinion regarding the constitutionality of the electric chair. Second, I again urge the Legislature to offer lethal injection as an alternative method of execution.

I. Constitutionality of the Electric Chair
I agree with the majority in upholding the circuit court's findings regarding electrocution as a constitutional method of execution. While I am disturbed by the graphic photographs of Allen Lee Davis' body following his July 8, 1999, execution, I do not find this alone enough to deem electrocution "cruel or unusual" punishment. "Since it is the method of execution that is challenged, it follows that a court must focus on the procedure as a whole and over time, rather than on any one particular execution." Fierro v. Gomez, 865 F.Supp. 1387, 1411 n. 25 (N.D.Cal. 1994) (permanently enjoining California from executing inmates by lethal gas), aff'd, 77 F.3d 301 (9th Cir.) (affirming injunction based on district court's factual findings regarding pain), vacated, 519 U.S. 918, 117 S.Ct. 285, 136 L.Ed.2d 204 (1996) (vacating judgment and remanding for further consideration in light of California's subsequently amended death penalty statute providing that lethal injections should be used to carry out death sentences unless the defendant requests that the State use the gas chamber). As explained by the district court in Fierro, the key question to be answered in a challenge to the method of execution is how much pain the inmate suffers. Id. at 1411. Where "unconsciousness is `likely to be immediate or within a matter of seconds'" the method is within constitutional limits. Id. (quoting Campbell v. Wood, 18 F.3d 662, 687 (9th Cir.1994) (finding that Washington's execution by judicial hanging did not violate prohibition against cruel and unusual punishment)). The record in the instant case contains competent, substantial evidence to support the conclusion that Davis was rendered unconscious instantaneously when the current was applied. This Court may not arbitrarily overturn the circuit court's finding based upon conflicting evidence in the record. See Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976) ("It is not the function of the appellate court to substitute its judgment for that of the trial court through reevaluation of the testimony and evidence from the record on appeal before it. The test, as pointed out in Westerman [v. Shell's City, Inc., 265 So.2d 43 (Fla.1972),] is whether the judgment of the trial court is supported by competent evidence.").

II. Lethal injection: The Need for Legislative Action
However, as I suggested in my concurring opinion in Jones v. State, 701 So.2d 76, 80 (Fla.1997) (Harding, J., specially concurring), I urge the Legislature to revisit *417 this issue and pass legislation giving death row inmates the choice between lethal injection and electrocution as the method of carrying out the death penalty. See Art. I, § 17, Fla. Const. ("Methods of execution may be designated by the Legislature."); see generally, e.g., Ariz.Rev.Stat. Ann. § 13-704(b) (West Supp.1998) (defendant sentenced to death for offense committed prior to date of amended statute shall choose either lethal injection or lethal gas; execution by lethal injection if the defendant fails to choose method); Cal.Penal Code § 3604(b) (West Supp.1999) (same); S.C.Code Ann. § 24-3-530(A) (Law Co-op. Supp.1998) (election between electrocution and lethal injection; if defendant waives right of election, then penalty must be administered by lethal injection); Utah Code Ann. § 77-18-5.5 (1995) (election between firing squad and lethal injection; where no preference is stated, execution is by lethal injection); Va.Code Ann. § 53.1-234 (Michie 1998) (election between electrocution and lethal injection; lethal injection where prisoner fails to choose in timely manner); Wash. Rev.Code § 10.95.180(1) (1998) (death shall be inflicted by lethal injection unless defendant elects hanging).
Florida death row inmates almost routinely challenge electrocution as a cruel or unusual method of punishment. See, e.g., Davis v. State, 742 So.2d 233 (Fla.1999), cert. denied, 68 U.S.L.W. 3136, ___ U.S. ___, 120 S.Ct. 13, 144 L.Ed.2d 817 (1999), and cert. denied, 68 U.S.L.W. 3136, ___ U.S. ___, 120 S.Ct. 13, 144 L.Ed.2d 817 (1999); Remeta v. State, 710 So.2d 543, 546 (Fla.), cert. denied, 523 U.S. 1055, 118 S.Ct. 1383, 140 L.Ed.2d 526 (1998); Jones v. State, 701 So.2d 76, 80 (Fla.1997), cert. denied, 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998); Stano v. Singletary, 692 So.2d 180, 181 (Fla.1997). Such challenges consume an inordinate amount of the time and resources expended by inmates' counsel, State counsel, and judicial personnel. Furthermore, each time an execution is carried out, the courts wait in dread anticipation of some "unforeseeable accident" that will set in motion a frenzy of inmate petitions and other filings. See Jones, 701 So.2d at 76 n. 1, 77 (discussing Pedro Medina's 1997 execution, where flames were seen near the headpiece of the electric chair and smoke emanated from under the headpiece; circuit court found that flame and smoke were caused by insufficient saline solution on the sponge in the headpiece of the electric chair); Buenoano v. State, 565 So.2d 309, 310-11 (Fla. 1990) (discussing flames and smoke that erupted from the headpiece of the electric chair during the 1990 execution of Jessie Tafero; investigation concluded that the irregularities in Tafero's execution were caused by the use of a synthetic sponge).
It is my view that the Legislature can foreclose many of these claims by simply amending Florida's death penalty statute to provide that death sentences should be carried out by lethal injection unless the defendant requests execution by electrocution. See Fierro v. Terhune, 147 F.3d 1158, 1160 (9th Cir.1998) (finding that California inmates lacked standing to challenge constitutionality of execution by lethal gas and claims were not ripe for decision where the inmates had not chosen execution by lethal gas); Poland v. Stewart, 117 F.3d 1094, 1104 (9th Cir. 1997) (finding that similar challenge to identical Arizona statute was not ripe because inmate had not chosen lethal gas as method of execution). While an inmate's choice of electrocution would not constitute a waiver of his or her Eighth Amendment protections and would not foreclose a constitutional challenge to this method of execution, see LaGrand v. Stewart, 173 F.3d 1144 (9th Cir.1999), the alternative method of lethal injection would still be available even if a constitutional challenge of electrocution proved successful. See id. at 1149 (ordering that no inmates be executed by lethal gas and that inmate bringing challenge could not be executed pursuant to the existing death warrant which required execution by lethal gas, but also recognizing that *418 warrant could be "reissued in a form that does not require execution by lethal gas").
Although not determinative of the Eighth Amendment claim, I find it significant that a number of other states that once relied on electrocution as the sole means of execution have now either entirely abandoned this method or offered an alternative. Nineteen of the states that currently permit capital punishment specified in 1970 that electrocution was the exclusive form of capital punishment. See Fierro, 865 F.Supp. at 1406. Today, of the thirty-eight states that permit capital punishment for the crime of first-degree murder, only four states rely on electrocution as the exclusive form of punishment. See Fla. Correct. Comm'n, 1997 Supplemental Report on Execution Methods Used by States at 48 (June 20, 1997) (on file with Library, Fla. Sup.Ct.) [hereinafter Commission Report]; Ky.Rev.Stat. Ann. § 431.220 (Michie Supp.1998) (establishing lethal injection as the sole means of capital punishment for defendants receiving death sentence on or after March 31, 1998, and giving the choice of electrocution or lethal injection to those prisoners sentenced prior to March 31, 1998); Tenn.Code Ann. § 40-23-114 (Supp.1998) (establishing lethal injection as the sole means of capital punishment for defendants receiving death sentence on or after January 1, 1999, and giving the choice of electrocution or lethal injection to those prisoners sentenced prior to January 1, 1999). In contrast, thirty-four states offer lethal injection either as a choice or as the exclusive form of punishment. See Commission Report at 48; Ky. Rev.Stat. Ann. § 431.220; Tenn.Code Ann. § 40-23-114. Clearly, the modern trend is towards rejecting electrocution as a method of capital punishment. In fact, in the 1997 report submitted to the Governor and the Legislature by the Florida Corrections Commission, the Commission recommended that Florida permit lethal injection as an alternative method of execution. See Commission Report at 28.
Finally, it is important to note that several courts, including the United States Supreme Court, have held that it is not an ex post facto violation to apply a change in execution methods retroactively. See Malloy v. South Carolina, 237 U.S. 180, 185, 35 S.Ct. 507, 59 L.Ed. 905 (1915); Hernandez v. State, 43 Ariz. 424, 32 P.2d 18, 25 (1934) (upholding amendment to statute which changed method of capital punishment from hanging to lethal gas); De-Shields v. State, 534 A.2d 630, 639 n. 7 (Del.1987) ("A statute which provides an optional method of death is not ex post facto legislation or an unlawful bill of attainder."); State ex rel. Pierre v. Jones, 200 La. 808, 9 So.2d 42, 46 (1942) (upholding amendment to statute which changed method of capital punishment from hanging to electrocution); State v. Fitzpatrick, 211 Mont. 341, 684 P.2d 1112, 1113 (1984) (upholding amendment to statute which allowed defendant to elect either lethal injection or hanging as the method of punishment); Woo Dak San v. State, 36 N.M. 53, 7 P.2d 940, 941 (1931) (upholding amendment to statute which changed method of capital punishment from hanging to electrocution); Ex parte Granviel, 561 S.W.2d 503, 510-11 (Tex.Crim.App. 1978) (upholding amendment to statute which changed method of capital punishment from electrocution to lethal injection); In re Personal Restraint of Benn, 134 Wash.2d 868, 952 P.2d 116, 149 n. 19 (1998) ("Retroactive application of a change in the method of execution does not violate the Ex Post Facto Clause where the change is to a more humane method."). In Malloy, the Supreme Court concluded that "[t]he statute under consideration did not change the penalty-death-for murder, but only the mode of producing this.... The punishment was not increased...." 237 U.S. at 185, 35 S.Ct. 507. In Weaver v. Graham, 450 U.S. 24, 33 n. 17, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the United States Supreme Court further explained its decision in Malloy, wherein the Court stated, "In Malloy v. South Carolina, we concluded that a change in the method of *419 execution was not ex post facto because evidence showed the new method to be more humane, not because the change in the execution method was not retrospective." (Citation omitted.) My research has not revealed a single state that has found the retroactive application of a more humane method of execution to be unconstitutional. This is true even though the sentence imposed specifically called for the previous method of execution.
For all of the reasons expressed, I believe that the Legislature will only improve death penalty jurisprudence in Florida by amending our state's statute to permit inmates to choose between lethal injection and electrocution. This is the prudent and proper step for the Legislature to take.
LEWIS, J., concurs.
WELLS, J., concurring.
I concur in the majority opinion and the separate concurring opinion of Justice Quince. I write briefly to make two points.
First, the Davis nosebleed has not provided any basis for this Court to reexamine this issue. This Court, on July 8, 1999, sent this case to a trial judge because of allegations that the electric chair did not function as intended in the Davis execution. The trial judge made the factual determination that those allegations were unfounded. Therefore, there is no basis to disturb the decision that this Court so recently made in Jones.
Second, in respect to Chief Justice Harding's recommendation as to lethal injection, obviously the legislature can relieve further complications involved with the electric chair issues by changing the method of execution to lethal injection for those crimes committed after the effective date of the legislation. I join in the recommendation to that extent.
However, I have to acknowledge that there are legal issues with the changing of sentencing laws for the punishment of crimes committed prior to a change in the law. This Court has been repeatedly taught that lesson by the United States Supreme Court. In Gomez v. Singletary, 733 So.2d 499 (Fla.1998), the majority made this point, pointing to Weaver v. Graham, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), Lynce v. Mathis, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), Calamia v. Singletary, 520 U.S. 1141, 117 S.Ct. 1309, 137 L.Ed.2d 473 (1997), and Lancaster v. State, 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 5 (1997). A great number of prisoners presently on death row have been sentenced to death by judgments which specify use of the electric chair because their sentences conformed with the existing law. All have been sentenced on the basis of section 922.10, Florida Statutes, which states: "A death sentence shall be executed by electrocution."
Not only does this United States Supreme Court precedent present legal issues on a change of this Florida statute, the Florida Constitution presents a legal issue in article X, section 9, which states expressly: "Repeal or amendment of a criminal statute shall not affect prosecution or punishment for any crime previously committed." (Emphasis added.) Justice Shaw's dissent acknowledges this legal issue in its footnote 53, recognizing this Court's precedent in Washington v. Dowling, 92 Fla. 601, 109 So. 588 (1926), from which he states he would recede.
A change to lethal injection for inmates may be legally attainable based upon an express waiver by the prisoner of any contest as to the method of execution. However, such a change requires full study and awareness by the legislature of the legal issues. Consequently, I do not join those that recommend it without acknowledging the consequent legal issues and that those legal issues will present matters for further litigation. I conclude that because of these outstanding legal issues the decisions as to this change are within the province of the legislature and are matters about which this Court cannot properly render *420 an advisory opinion regardless of our personal views as to that decision.
QUINCE, J., concurs.
QUINCE, J., specially concurring.
I agree with the majority's determination that death by electrocution is not cruel and unusual punishment within the meaning of the Eighth Amendment. While there has been much said about the Davis execution because of the blood which dripped from the inmate's nostril during this process, the real question presented here is whether or not the use of electrocution violates the "evolving standards of decency" espoused by the United States Supreme Court in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). The answer to this question is not easy and involves the analysis of several factors including the use of the particular method by other states. Although electrocution as the judicial method of execution has been abandoned in a number of states in favor of, for the must part, lethal injection,[2] that factor does not dispose of the issue.[3]
In Jones v. State, 701 So.2d 76 (Fla. 1997), cert. denied, 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998), this Court reiterated its prior determination that death by electrocution is not per se cruel and unusual punishment under the Eighth Amendment. See also Medina v. State, 690 So.2d 1241 (Fla.), cert. denied, 520 U.S. 1151, 117 S.Ct. 1330, 137 L.Ed.2d 490 (1997). And, citing to Hunt v. Nuth, 57 F.3d 1327 (4th Cir.1995), and Campbell v. Wood, 18 F.3d 662 (9th Cir.1994), we indicated that the question of whether electrocution was unusual because it was used in only six states[4] was subsumed in the larger question of per se unconstitutionality. In Hunt, the court addressed the constitutionality of judicial execution by lethal gas[5] and, in Campbell, the court addressed judicial execution by hanging.[6]
In both cases the courts were asked to declare the methods of execution cruel and unusual because they were only used by a few states, and many states had abandoned the methods in favor of lethal injection.[7] In making the determination that neither lethal gas nor hanging was violative of the Eighth Amendment, the Ninth and Fourth Circuits looked to other objective factors when possible. In Campbell, the court stated:
[M]ethodology review focuses more heavily on objective evidence of the pain involved in the challenged method. See, e.g., Glass v. Louisiana, 471 U.S. at 1084, 105 S.Ct. at 2162 (Brennan, J., dissenting)(noting that "[f]irst and foremost" among the "objective factors by which courts should evaluate the constitutionality of a challenged method of punishment" is whether the method involves "`the unnecessary and wanton infliction of pain.'" (Citation omitted.)) *421 The number of states using hanging is evidence of public perception, but sheds no light on the actual pain that may or may not attend the practice. We cannot conclude that judicial hanging is incompatible with evolving standards of decency simply because few states continue the practice.
Campbell, 18 F.3d at 682 (footnote omitted). In Hunt, the court made a similar observation in reference to the use of lethal gas when it opined:
Despite the court's thorough opinion,[[8]] we decline Hunt's invitation to become the first court to follow the reasoning in Fierro. Lethal gas currently may not be the most humane method of execution-assuming that there could be a humane method of execution-but the existence and adoption of more humane methods does not automatically render a contested method cruel and unusual. Before Fierro, a number of courts had held that execution by lethal gas did not violate the Eighth Amendment. Furthermore, we agree with the district court in Hunt's case that "graphic descriptions of the death throes of inmates executed by gas are full of prose calculated to invoke sympathy, but insufficient to demonstrate that execution by the administration of gas involves the wanton and unnecessary infliction of pain." Hunt III, 856 F.Supp. at 260; see also Campbell, 18 F.3d at 683.
Hunt, 57 F.3d at 1337-38 (citations omitted). Thus, both courts reject the notion that a method of execution is cruel and unusual because it is not a popular method.
Another objective criteria that the ninth circuit focused on was the role of the legislature in determining the appropriate punishment for crimes. The court in Campbell, quoting from Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), stated that a punishment selected by a duly elected legislature is presumed constitutional. This presumption holds true even if the legislature does not select the least severe penalty, so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. The Court in Gregg said:
[T]he requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts. This does not mean that judges have no role to play, for the Eighth Amendment is a restraint upon the exercise of legislative power.
"Judicial review, by definition, often involves a conflict between judicial and legislative judgment as to what the Constitution means or requires. In this respect, Eighth Amendment cases come to us in no different posture. It seems conceded by all that the Amendment imposes some obligations on the judiciary to judge the constitutionality of punishment and that there are punishments that the Amendment would bar whether legislatively approved or not." Furman v. Georgia, 408 U.S., at 313-314, 92 S.Ct. 2726 (White, J., concurring).

See also Id., at 433, 92 S.Ct. 2726 (Powell, J., dissenting).
Gregg, 428 U.S. at 174, 96 S.Ct. 2909. In evaluating the constitutionality of legislative action, the judiciary should not be swayed by its own individual notion of whether or not the particular judge would have chosen another course. Courts should instead give effect to the legislative enactment as a reflection of the will and the moral values of the people. However, while the laws and statutes enacted by the people's duly elected representatives are some evidence of contemporary values, again this is not determinative.
When drafting the Eighth Amendment, the framers of our constitution were primarily *422 concerned with proscribing torturous or barbarous punishments. See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). As a consequence, the primary objective factor, in addition to legislative action, that bears on the issue of the constitutionality of a particular method of execution is whether or not that method involves the "unnecessary and wanton infliction of pain." On that issue, in regards to the execution of Allen Lee Davis, the trial court found:
Allen Lee Davis did not suffer any conscious pain while being electrocuted in Florida's electric chair. Rather, he suffered instantaneous and painless death once the current was applied to him.
The nose bleed incurred by Allen Lee Davis began before the electrical current was applied to him, and was not caused whatsoever by the application of electrical current to Davis. This Court is unable to make a finding regarding the exact cause or situs of initial onset of the nose bleed because that information was not determined during either of the autopsies performed on Davis' body.
The post-execution photographs of Allen Lee Davis indicate that the straps used to restrain Davis' body, specifically, the mouth strap and chin strap, may have caused Davis to suffer some discomfort. However, the straps did not cause him to suffer unnecessary and wanton pain, and the mouth strap was not a part of the electrical operation of the electric chair.
The trial court's findings are based on substantial competent evidence that was adduced at the evidentiary hearing and must be upheld. See Tibbs v. State, 397 So.2d 1120 (Fla.1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). These findings support the trial court's ultimate conclusion that electrocution as a form of execution does not constitute cruel and unusual punishment.
In my estimation, little has changed since our analysis of this situation in Jones v. State. The pictures of the blood generated by Davis's nosebleed are not pleasant. However, we must keep in mind that the nosebleed does not per se relate to the proper functioning of the electric chair. The two issues are not, under the circumstances of this case, intertwined.
I join in the trial court's suggestion to the Department of Corrections that the mouth strap should be replaced or other sizes used depending on the size of the inmate. Such a change, assuming the bleeding and the facial discoloration resulted from the placement of the mouth strap, should eliminate some of the "ghastliness" associated with the photographs of the Davis body, and eliminate some of the human error that seems to plague this form of execution.
For the reasons stated above, I would affirm the trial court's determination that Florida's use of electrocution as the sole method of execution is not cruel and unusual punishment.
WELLS, J., concurs.
SHAW, J., dissenting.
The overarching question presented in this case is whether continued use of electrocution as the official method of execution in Florida comports with the state and federal constitutions. This question has not been directly confronted by this Court in any casedespite a widespread belief that the issue has been duly decided. At most, this Court on one occasion has conducted a "snapshot" review of the execution apparatus, i.e., the electric chair, and concluded that use of the chair at that point in time did not violate the constitution because any problems had been fixed and inmates suffered no conscious pain.[9] *423 The Court did not address violence or mutilation or the per se constitutionality of electrocution as a mode of execution in Florida. That issue was procedurally barred:
The claim that execution by electrocution is unconstitutional per se is hereby denied as procedurally barred as it could have been raised in previous petitions for relief.
Jones v. Butterworth, 691 So.2d 481, 482 (Fla.1997) (emphasis added).
In light of continuing malfunctions and mishaps with this method of execution in Florida, I am convinced that the time has now come to confront this issue head-on, and it is my conclusion that electrocution as it has been administered in Florida is unconstitutional. I would direct that the sentence in the present case be carried out by lethal injection as prescribed by statute.[10]

I. FACTS
Following the recent bloody execution of Allen Lee Davis on July 8, 1999, this Court remanded the present case to the trial court to conduct an evidentiary hearing on a single narrow issuethe present functioning of Florida's electric chair. At the conclusion of the hearing, the trial court inter alia made two findings despite considerable evidence to the contrary: (1) Florida's electric chair functioned as intended during the Davis execution; and (2) Davis suffered no conscious pain. The court ruled as follows:
Execution by electrocution in Florida's electric chair as it exists in its present condition as applied does not constitute cruel or unusual punishment, and therefore, is not unconstitutional.
(Emphasis added.) The court focused only on the question before it and did not address the issues of violence or mutilation or the overall record of electrocution as a method of execution in Florida.
The present majority opinion affirms the conclusion of the trial court, focusing on the present functioning of the chair and the lack of pain:
This Court recently concluded in Jones v. State, 701 So.2d 76, 79 (Fla. 1997), that "[i]n order for a punishment to constitute cruel or unusual punishment, it must involve `torture or lingering death' or the infliction of `unnecessary and wanton pain.'" (citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947)). The record in this case reveals abundant evidence that execution by electrocution renders an inmate instantaneously unconscious, thereby making it impossible to feel pain. The record also contains evidence that the electric chair is and has been functioning properly and that the electrical circuitry is being maintained.
Majority op. at 415. The majority opinion then proceeds to extrapolate from the narrow "snapshot" ruling of the trial court and concludes broadly that use of Florida's electric chair in general is not cruel or unusual punishment, citing Jones v. State, 701 So.2d 76 (Fla.1997):
In Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997), this Court stated, "As long as the trial court's findings are supported by competent substantial evidence, `this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" We find that the circuit court's findings of fact are supported by competent substantial evidence. Therefore, we again conclude, as we did in Jones, *424 that Florida's electric chair is not cruel or unusual punishment.

Majority op. at 415 (emphasis added). The majority opinion summarily rejects Provenzano's "evolving standards of decency" claim, again citing Jones:
In issue two, Provenzano claims that Florida's current use of electrocution as its sole method of execution is unconstitutional because it violates the evolving standards of decency that mark the progress of a maturing society. This claim was rejected by this court in Jones. See 701 So.2d at 79.
Majority op. at 415 (emphasis added).
This reliance on Jones is misplaced. Contrary to what the majority opinion assumes, the trial courts both in Jones and the present case never reached the broad issue of the per se constitutionality of electrocution as a method of execution in Floridathat issue was beyond the scope of the evidentiary hearings in both cases. Nor did this Court in Jones address this issuefor the issue was found to be procedurally barred.

II. FLORIDA'S CRUEL AND UNUSUAL PUNISHMENT CLAUSE
Article I, section 17, Florida Constitution, proscribes punishments that are "cruel and unusual":
SECTION 17. Excessive punishments. Excessive fines, cruel and unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden.

Art. I, § 17, Fla. Const. (emphasis added). The question posed in the present case is whether this prohibition bars the use of electrocution as the official method of execution in Florida.
The present majority opinion relies on Jones v. State, 701 So.2d 76 (Fla.1997), to resolve this issue. Following the fiery execution of Pedro Medina in 1997, this Court remanded Jones' case to the trial court to conduct an evidentiary hearing on the limited issue of whether use of Florida's electric chair in its then-current condition constituted "cruel or unusual" punishment. Jones v. Butterworth, 691 So.2d 481 (Fla.1997). The trial court found that the malfunction (an improperly moistened sponge in the head-piece) had been fixed, that the chair was now working properly, and that Medina had suffered no conscious pain. This Court affirmed.
This Court refused to consider Jones' contention that electrocution in general is unconstitutional under evolving standards of decency. The Court explained:
Jones also argues that the trial judge erred in refusing to admit and consider evidence that execution in Florida is unusual because there is a trend away from execution through the use of the electric chair as a means of capital punishment and because only six states currently employ the electric chair as a means of execution. The trial judge properly excluded this evidence as being beyond the scope of the issue which he had been assigned to decide. Our previous ruling that execution by the use of the electric chair is not per se unconstitutional subsumed the argument that Jones now makes. See Campbell v. Wood, 18 F.3d 662, 682 (9th Cir.1994) ("We cannot conclude that judicial hanging is incompatible with evolving standards of decency simply because few states continue the practice."); Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir.1995) ("[T]he existence and adoption of more humane methods [of execution] does not automatically render a contested method cruel and unusual.").
Jones, 701 So.2d at 79 (emphasis added)(footnote omitted). The Court ultimately held as follows: "We hold that electrocution in Florida's electric chair in its present condition is not cruel or unusual punishment." Id. at 80 (emphasis added).
It is clear from the above that this Courtand the trial courtdid not address *425 the issue of whether Medina suffered undue violence or mutilation or whether electrocution is constitutional as the traditional method of execution in Florida. Rather, the Court conducted a "snapshot" review of the current functioning of Florida's electric chairi.e., the Court limited its review to whether the electric chair was working properly at that point in time and whether Medina had suffered unnecessary pain. The Court disposed of Jones' per se constitutionality claim by referring to its earlier ruling in the case. ("Our previous ruling that execution by the use of the electric chair is not per se unconstitutional subsumed the [evolving standards of decency] argument that Jones now makes." Id.) A review of that earlier ruling, however, shows that the Court never addressed the per se constitutionality issue on the merits but rather disposed of it procedurally.[11] Nowhere in our two decisions in Leo Jones' case did the Court directly address this issue; it was never properly before the Court.
A review of this Court's death penalty precedent reveals that in those cases in which this issue was raised, the Court disposed of the matter in summary fashion without analysis.[12] The State points to no case from this Court where this method of execution was subjected to explicit constitutional scrutiny. Existing Florida precedent construing the Cruel and Unusual Punishment Clause in other situations offers little insight. Accordingly, this Court is obliged to turn to United States Supreme Court precedent for guidance.

III. FEDERAL CRUEL AND UNUSUAL PUNISHMENTS CLAUSE
The Eighth Amendment to the United States Constitution bars punishments that are "cruel and unusual":
Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII (emphasis added). This provision is of key importance in evaluating the lawfulness of a method of execution.

A. The Kemmler Standard"Mere Extinguishment of Life"
The United States Supreme Court last confronted a "method of execution" case in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890), the case that inaugurated electrocution as a method of execution in this country.[13] That case is still the seminal case in this field and, contrary to *426 popular belief, does not stand for the proposition that electrocution is per se lawful ad infinitum if there is no pain.[14] Rather, the Court in Kemmler simply acceded to the state court's finding thatgiven the available options at that point in time in the nineteenth centuryelectrocution was permissible as a more humane form of execution than hanging. As explained below, the enduring legal principle articulated in that casei.e., the Kemmler standard is far more broad and goes to the very heart of the Eighth Amendment.
The Court in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890), was asked to invalidate New York's newly enacted statutory scheme, which replaced hanging with electrocution as the official method of execution. The Court declined to invalidate the statute. First, the Court noted that death by hanging had been recognized by the governor of New York to be barbaric, and that the governor had called upon the state legislature to find a better method:
It appears that the first step which led to the enactment of the law was a statement contained in the annual message of the governor of the State of New York, transmitted to the legislature January 6, 1885, as follows: "The present mode of executing criminals by hanging has come down to us from the dark ages, and it may well be questioned whether the science of the present day cannot provide a means for taking the life of such as are condemned to die in a less barbarous manner. I commend this suggestion to the consideration of the legislature."
Id. at 444, 10 S.Ct. 930. Second, the Court pointed out that the state legislature had acted faithfully on the governor's commendation:
The legislature accordingly appointed a commission to investigate and report "the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases." This commission reported in favor of execution by electricity, and accompanied their report by a bill which was enacted and became chapter 489 of the Laws of 1888.
Id. And finally, the Court noted that: (a) the state legislature had determined that electrocution was a more humane method of punishment; (b) the trial court had collected a "voluminous mass of evidence" on both sides of the issue and had reached the same conclusion, and (c) the state courts at every level had agreed with that conclusion.
In addressing the Cruel and Unusual Punishments Clause in this context,[15] the United States Supreme Court set forth what has become known as the Kemmler standard. That standard, which bars anything more than "the mere extinguishment of life," is now the abiding criterion for evaluating the constitutionality of a method of execution:
Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the Constitution. [Cruelty] implies... something inhuman and barbarous, something more than the mere extinguishment of life.

*427 Id. at 447, 10 S.Ct. 930 (emphasis added). In short, to comport with the constitution, a method of execution is limited to "the mere extinguishment of life"to the extent that this is reasonably possible. Any adverse effect beyond that point (i.e., any undue pain, violence, mutilation, or disgrace) is gratuitous and thus "inhuman and barbarous." The Court ultimately deferred to the state legislature's and courts' determination that electrocution was a more humane method of execution than hanging and declined to invalidate the New York statute. Id. at 449, 10 S.Ct. 930.
Although the United States Supreme Court has not confronted a "method of execution" case since Kemmler, the Court has ruled on a number of other government practices under the Cruel and Unusual Punishments Clause, as explained below. The Kemmler standard is reaffirmed in many of these cases. In reviewing these cases, a broad schematic for construing the Clause in "method of execution" cases emerges, embracing the following points: (1) While pain is a relevant indicator of cruelty, it is not the only indicator; (2) violence, mutilation, and disgrace are also relevant indicators of cruelty; and (3) the legal dimensions of cruelty are measurable against evolving standards of decency.

1. Undue Pain
In the olden days, a common component of punishments meted out by the crown was the intentional infliction of pain, violence, mutilation, and disgrace, for the crown viewed wanton cruelty as both a deterrent and a mode of vengeance and retribution. Upon our nation's birth, however, the Cruel and Unusual Punishments Clause was erected by the founding fathers as a resolute barrier to this repugnant practice, particularly where methods of execution were concerned.[16] While some degree of suffering is unavoidable in any means of taking life, the Clause focuses on any excessive cruelty which inheres in the method of executionnot that inevitable suffering which exists in the mind of the condemned.[17]
To meet the requirement that a punishment not be impermissibly cruel, a method of execution first of all must inflict no undue pain. As the United States Supreme Court stated: "The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence." Louisiana ex rel. Francis v. Resweber, 329 U.S. at 463, 67 S.Ct. 374.
The all-important consideration is that the execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as *428 possible, to no more than that of death it self.
Id. at 474, 67 S.Ct. 374 (Burton, J., dissenting).
California's gas chamber has been found to be impermissibly cruel under this test, for while lethal gas as applied in California involves minimal violence and mutilation, it inflicts substantial pain (i.e., intense visceral pain from oxygen deprivation) and results in a slow, lingering death akin to artificial drowning (i.e., the inmate may remain conscious for several minutes) and thus is cruel in its effect.[18] Execution by gas is to be distinguished from lethal injection, which is generally considered more humane.[19]

2. Undue Violence, Mutilation, and Disgrace
Although pain is an important indicator of cruelty, it is not the only indicatorfor a method of execution can involve minimal pain and yet still be extraordinarily cruel. To meet the requirement that a punishment not be impermissibly cruel, a method of execution also must entail no undue violence, mutilation, or disgrace:
The Eighth Amendment's protection of "the dignity of man" extends beyond prohibiting the unnecessary infliction of pain when extinguishing life. Civilized standards, for example, require a minimization of physical violence during execution irrespective of the pain that such violence might inflict on the condemned. Similarly, basic notions of human dignity command that the State minimize "mutilation" and "distortion" of the condemned prisoner's body.
Glass, 471 U.S. at 1085, 105 S.Ct. 2159 (Brennan, J., dissenting from denial of certiorari).[20]
As conceded by the State in the present proceeding, the guillotine as used in the French Revolution is a prime example of a method that would fail in this regard, for while beheading results in a quick, relatively painless death,[21] it entails frank violence *429 (i.e., gross laceration and blood-letting) and mutilation (i.e., decapitation) and disgrace (i.e., public spectacle) and thus is facially cruel. Post-execution disfiguremente.g., dismemberment, disembowelment, decapitation, flaying, or dragging of the bodyand displaying of the mutilated corpse similarly would be forbidden even though this practice involves no conscious pain. Forced public disrobing prior to execution also would be forbidden.
In the present case, the State in oral argument before this Court conceded that use of the guillotine as a method of execution would fail constitutional muster in all states under the Cruel and Unusual Punishments Clause. By this concession, the Stateof necessityagrees that there are other indicators of cruelty besides pain. I suggest that these additional indicators inhere in the method of execution. Thus far in Florida, we have suppressed any reasoned consideration of these additional factors by limiting the scope of the inquiry at the evidentiary hearings, wherein the courts have focused only on pain.

B. Evolving Standards of Decency
Subsequent to its decision in Kemmler, the United States Supreme Court concluded that the Constitutionin order to retain meaning and effectmust exist in our society as a dynamic force.[22] The Court then articulated a new standard for evaluating certain government practices under the Cruel and Unusual Punishments Clausethe "evolving standards of decency" criterion:
The Court [has] recognized ... that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

Trop v. Dulles, 356 U.S. 86, 100-01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (emphasis added).[23] The Supreme Court has reviewed a number of government practices under this standard, including the imposition of the death penalty for various offenses.[24] This review generally includes three considerations: (1) Whether the practice has been approved, rejected, or abandoned in other states;[25] (2) whether the practice has been approved, rejected, or abandoned by the governments of other civilized nations;[26] and (3) whether other less cruel modes of punishment are available.[27]

*430 C. Analysis Used by Lower Federal Courts
Unlike the United States Supreme Court, the lower federal courts have ruled on the constitutionality of several methods of execution in recent years. The analytical model that emerges from these rulings has two steps. The court first determines whether a method of execution is limited to "the mere extinguishment of life." If the method is not so limited and entails adverse effects beyond that point, the court then must determine if these effects are "undue." To assist in this second step, the court may apply the "evolving standards of decency" criterion. Two federal circuit court cases are instructive.[28]
The Ninth Circuit in Campbell v. Wood, 18 F.3d 662 (9th Cir.1994), upheld the State of Washington's alternative method of execution,[29] hanging, against a challenge under the Cruel and Unusual Punishments Clause.[30] After conducting an evidentiary hearing on the issue, the trial court noted two points: (1) Hanging in Washington is conducted pursuant to "Field Instruction WSP 410.500," an exhaustively detailed execution protocol adopted from the military; and (2) after adoption of the protocol, the only hanging conducted in the state had been performed flawlessly several years earlier.[31]Campbell, 18 F.3d at 683, 685. The trial court then concluded that "hanging according to the protocol does not involve lingering death, mutilation, or the unnecessary and wanton infliction of pain." Id. at 687. The circuit court deferred to the trial court's findings and declined to conduct an "evolving standards of decency" analysis. Id. at 682. There was no point in looking at other states; execution by hanging as carried out in Washington clearly entailed no undue pain or mutilation.[32]
Two years later, the Ninth Circuit in Fierro v. Gomez, 77 F.3d 301 (9th Cir. 1996), held California's alternative method of execution,[33] lethal gas, unconstitutional. The trial court had conducted an eight-day bench trial on the issue and concluded that lethal gas as applied in California resulted in extreme physical pain. The circuit *431 court again deferred to the trial court's findings and declined to conduct an "evolving standards of decency" analysis. Id. at 308. There was no point in looking at other states; execution by lethal gas as carried out in California clearly entailed undue pain.
Although the Ninth Circuit in both Campbell and Fiero declined to apply the "evolving standards of decency" criterion, this was due to the particular facts of those cases. In the eyes of the court, the proper result in each case was clear-cut and was dictated by circumstances in the home state. The court did not hold that the "evolving standards of decency" criterion could never be used in a "method of execution" casefor logic suggests that the criterion would be helpful in a case where the constitutionality vel non of the method is not clear-cut (which is the situation in the present case).

IV. THREE RECENT EXECUTIONS
The administration of electrocution in Florida demonstrates the cruelty inherent in this method of execution. Not only was every execution in Florida accompanied by the inevitable convulsing and burning that characterizes electrocution,[34] but further, three executions in particular were marred by extraordinary violence and mutilation. In two of these executions, smoke and flames spurted from the headpiece and burned the heads and faces of the inmates. In the third execution, the inmate bled from the nostrils and was at least partially asphyxiated by the restraining devices; and he too was burned.

A. Tafero's Execution
Florida's electric chair malfunctioned during the execution of Jesse Tafero on May 4, 1990, resulting in a violent scene, with smoke and foot-long flames spurting from his head. This Court described the scene:
When Tafero's execution began, smoke and flames instantaneously spurted from his head for a distance of as much as twelve inches. The flames and smoke emanated from the area around a metallic skull cap, inside of which was a saline-soaked synthetic sponge meant to increase the flow of electricity to the head. The cap is the source of electricity administered to condemned prisoners by the electric chair.
Because of the smoke and flames, officials of the Department of Corrections stopped the first surge of electricity. A second jolt again resulted in smoke and flames spurting from Tafero's head. Finally, a third jolt of electricity was administered. A medical examiner found that Tafero was dead some six or seven minutes after the execution commenced.
Thereafter, the Governor ordered the Department of Corrections to conduct an investigation into the circumstances of Tafero's execution. The Department reported that the equipment was in proper working order. However, it was determined that for the first time a synthetic, rather than a natural, sponge had been used in the headpiece. The Department concluded that the burning of the sponge caused the flames and smoke which were seen during Tafero's execution.... The Department ... noted that most executions last longer than seven minutes.
Buenoano v. State, 565 So.2d 309, 310-11 (Fla.1990).
The mutilated condition of Tafero's body was described in the sworn statement of a witness:
I have seen the bodies of three other inmates executed by officials of the Florida State Prison. I saw them at approximately the same length of time after they were executed as I saw Mr. Tafero's body. None of the other bodies I saw before had the severe burning and scorching and damage to the head as did Mr. Tafero's. None had any marks on the face at all.

*432 The entire top of Mr. Tafero's head is covered with wounds. There is one dominant charred area and a myriad of smaller gouged, raw areas to the upper right side and lower right of the large burned area.
The dominant charred area is on the top left side of the head. It is larger than my hand.... The funeral director said that this was a third degree burn. The rest of that area was a dark brownish color, slightly lighter than the charred area. The funeral director said that this would be a second degree burn.
Id. at 314 (Kogan, J., dissenting). Additionally, Tafero's eyebrows, eyelashes, and facial hair were burned when flames licked his face. See Jones, 701 So.2d at 87 (Shaw, J., dissenting).

B. Medina's Execution
Florida's electric chair malfunctioned again during the execution of Pedro Medina on March 25, 1997, resulting in another violent scene with smoke and flames spurting from the head-piece. Unlike Tafero, Medina's eyebrows, eyelashes, and facial hair were not burned off. However, Medina's head was charred and his face was scalded. The trial court in Jones described the execution:
When Pedro Medina was executed on March 25, 1997, the following events occurred. When the electrical current was activated, within seconds ... smoke emanated from under the right side of Medina's head piece, followed by a 4 to 5 inch yellow-orange flame which lasted 4 to 5 seconds and then disappeared. After the flame went out, more smoke emanated from under the head piece to the extent that the death chamber was filled with smokebut the smoke was not dense enough to impair visibility in or through the chamber. The smoke continued until the electrical current was shut off in the middle of the third cycle. Although several witnesses to the execution tried to describe the odor of the smoke, only one witness, Florida State Prison Superintendent Ronald McAndrews, described the odor as burnt sponge.... This Court finds that the odor smelled was burnt sponge, not burnt flesh.
The physician's assistant, William Mathews, examined Medina's body. At that time, Medina was not breathing or exchanging air through his nostrils; his pupils were fixed and dilated; and he had an agonal pulse and heart sounds. When the physician's assistant was no longer able to detect any pulse or heart sounds, the attending physician, Dr. Almojera, examined Medina and pronounced him dead at 7:10 a.m. During Dr. Almojera's last examination Medina's chest was seen to move two or three times in a two to four minute period. A couple of witnesses thought Medina was trying to breathe. Several witnesses did not describe it as attempted breathing, but as a lurching, spasmodic movement, a shudder, and outward not upward movement. No witness, particularly those closest to Medina, could state that he was in fact breathing or attempting to breathe.
Jones, 701 So.2d at 86 (Shaw, J., dissenting).
As with Tafero's body, Medina's body also was mutilated by the electrocution. The findings of the pathologists who conducted the autopsy of Medina were summarized by the trial court in Jones:
1. The head had a "burn ring" on the crown of the head that was common in executions by judicial electrocution.
2. Within the "burn ring" there was a third degree burn on the crown of the head, with deposits of charred material....
3. There was a first degree burn of the upper front face and head, caused by scalding steam.... Unlike the Tafero execution, Medina had no burning of the eyebrows, eyelashes, or small hairs of the face that would have resulted if the burning had been the result of a flame rather than steam.
*433 Jones, 701 So.2d at 86-87 (Shaw, J., dissenting).

C. Davis' Execution
The execution of Allen Lee Davis on July 8, 1999, differed from prior executions in that here Department of Corrections ("DOC") officials took post-execution color photos of Davis before he was removed from the electric chair. (Several of the photos are appended to this dissenting opinion.) These photos, when combined with eye witness accounts, provide a vivid picture of a violent scene. According to witnesses' accounts, when Davis was being strapped into the chair, guards placed a solid leather mouth-strap across his mouth and nose area. This mouth-strap is wideapproximately five inches from top to bottomand it covered the entire lower portion of Davis's face from the bottom of his chin to immediately below his nose.[35] The strap was fastened so tightly against his face and was so wide that it pushed his nose severely upward, blocking his nostrils at least partially. A heavy fabric face-mask was placed on top of this apparatus, further occluding his airway. And then, as explained below, blood began flowing from his nose prior to electrocution. This too obstructed his nostrils.
The trial court below explained that the pathologist who conducted a post-execution autopsy on Davis concluded that he had been at least partially asphyxiated prior to electrocution:
Robert Kirschner, M.D., forensic pathologist from Illinois, testified as an expert in the area of forensic pathology. Kirschner testified that he performed an autopsy on the body of Allen Lee Davis. He testified that during Davis's autopsy, he was unable to identify the precise source of the nose bleed that Davis suffered, but that it was coming from the septal area of the left nostril. Kirschner testified that the placement of the mouth strap across Davis' mouth inhibited Davis' breathing and caused him to become at least partially asphyxiated before the application of electrical current to him. Kirschner testified that he is of the opinion that Davis' death was caused by electrocution and association of partial asphyxiation which occurred before the electrocution. ...
. . . .
Aubrey D. Thornton, Assistant Warden at Florida State Prison, testified that he was one of the individuals responsible for strapping Allen Lee Davis into the electric chair.... Thornton also testified that Davis' face began to turn red after the mouth strap was applied to him ....
(Emphasis added.) After Davis' airflow had been blocked by the mouth-strap, the face-mask, and his own blood, Davis made several sounds under the face-mask which were described variously as muffled screams, moans, or yells, as if he were attempting to get the guards' attention. The trial court gave the following description:
John W. Moser, Capital Collateral Regional Counsel for the Middle Region, testified that in his capacity as Capital Collateral Regional Counsel, he witnessed the execution of Allen Lee Davis. Moser testified that between the time Davis was secured in the electric-chair and the time the electrical current was applied to Davis, he heard what sounded like two screams from Davis. ...
Mark Lazarus, Victim Assistance Administrator for the Florida Department of Corrections, testified that he observed the execution of Allen Lee Davis. Lazarus testified that after the head piece was placed on Davis' head, he heard two one-syllable sounds coming from Davis and that the sounds sounded like Davis *434 was trying to "make some noise" or "yell out." ...
. . . .
Thomas Varnes, Warden at Wakulla Correctional Institution, testified that he witnessed the execution of Allen Lee Davis. Varnes testified that after the mouth strap and chin strap of the head piece were tightened and the face mask was lowered, he heard Davis moan like he was trying to say something. ...
. . . .
James Crosby, Warden of Florida State Prison testified that after the mouth piece was placed on Davis, and just before the execution, he heard two muffled sounds from Davis, which sounded like Davis was trying to say something.

(Emphasis added.)
Prior to and during the electrocution, blood flowed freely from Davis' nose, ran over the mouth-strap, and spilled onto his chest, forming a pool the size of a dinner plate on his white shirt. Again, in the words of the trial court below:
Sheila McAllister, Correctional Probation Officer at Wakulla Correctional Institution, testified that she witnessed the execution of Allen Lee Davis.... McAllister also testified that while the current was on she observed blood on Davis' chest, and she observed something dripping from behind Davis' mask.

. . . .
Michael R. Collins, employed with Florida State Prison as a nurse, testified that he attended the execution of Allen Lee Davis.... Collins further testified that after the electrical current was stopped and after Mr. Matthews, the Florida State Prison physician's assistant, was examining Davis, he observed blood on Davis' shirt in his chest area and on his upper right side, by his collar. Collins stated that the blood was dripping from under the mask ....
. . . .
William Muse, Lieutenant with the Florida Department of Corrections, assigned to Florida State Prison, testified that he witnessed the execution of Allen Lee Davis.... Muse testified that after the cycle of current had been terminated, he observed blood on Davis' shirt, blood on the strap, and blood coming from Davis' nostril[s].

(Emphasis added.) In light of the placement of the mouth-strap, the positioning of the face-mask, and the flow of blood from his nostrils, it is reasonable to conclude as did Dr. Kirschnerthat Davis was being smothered before he was electrocuted.
And finally, as with Tafero and Medina, Davis' body was mutilated by burns on the head, face, and leg, as noted in the trial court's order:
The deposition of William Hamilton, M.D., Medical Examiner for the Eighth Judicial Circuit, was read into the record due to Hamilton's unavailability.... Hamilton testified that Davis had burns on his scalp and forehead, on his super-pubic and right upper medial thigh region, and behind the right knee.

(Emphasis added.)
The color photos taken by DOC show a ghastly post-execution scene: Davis is wearing a white shirt and dark pants and is restrained in the wooden chair by thick leather straps placed across his arms, legs, torso, and mouth; the electrical head-piece is attached to the top of his head with a leather strap that runs under his chin; a sponge placed under the head-piece obscures the entire top portion of his head down to his eyebrows; because of the width of the mouth-strap, only a small portion of Davis' face is visible above the mouth-strap and below the sponge, and that portion is bright purple and scrunched tightly upwards; his eyes are clenched shut and his nose is pushed so severely upward that it is barely visible above the mouth-strap; although the exterior openings of Davis' nostrils are partially visible, it appears as though the interior *435 openings may be covered by the mouth-strap; a stream of blood pours from his nostrils, flows over the wide leather mouth-strap, runs down his neck and chest, and forms a bright red pool (approximately eight by twelve inches) on his white shirt. The scene is unquestionably violent.

V. ELECTROCUTION IN FLORIDA IS UNCONSTITUTIONALLY CRUEL
As noted above, the abiding standard for determining the constitutionality of a method of execution is the "mere extinguishment of life" standard set forth in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). Execution by electrocution as administered in Florida violates this standard because it entails undue violence and mutilation. Additionally, execution by electrocution as practiced in Florida is inconsistent with evolving standards of decency.

A. Electrocution Violates the Kemmler Standard
Although a total of twenty executions were carried out "successfully" in the intervening years between the Tafero, Medina, and Davis executions, this statistic is insufficient to save Florida's method of execution from constitutional infirmity. In even the "successful" executions, the inmate was subjected to violence (i.e., the inmate was administered an electrical force that caused him to convulse violently) and mutilation (i.e., the body of each inmate was burned on the head and leg as a result of the electrocution process). Additionally, in three out of twenty-three executions, i.e., in thirteen percent of executions, the prisoner was subjected to extreme violence and mutilation when the execution was botched.[36]
In two of these botched executions (Tafero and Medina), the prisoner was engulfed in smoke and flames when the switch was pulled. The head of one prisoner (Tafero) was burned and charred, his face was licked by flames, and his eyebrows, eyelashes, and facial hair were burned; his head also was gouged and made raw with wounds. The head of another (Medina) was burned and charred and his face was scalded. In the third botched execution (Davis), the prisoner suffered blood flowing from his nose and pooling on his chest; he was likely asphyxiated at least partially prior to electrocution, and he attempted to scream or yell after his airway was occluded; he too was burned on his head, face, and leg.
Each of the botched executions was sufficiently egregious to halt further executions and to prompt an extensive official inquiry, complete with an evidentiary hearing and voluminous testimony by eye witnesses and experts. Each botched execution also was transformed by the media into a world-wide spectacle, telecommunicated throughout the world in lurid and inflammatory detail.
Following the Tafero execution, the federal district court in Florida addressed the issue of repeated mishaps:
If a pattern of malfunctions develops, perhaps even as few as two consecutive or nearly consecutive executions, then it may become appropriate to consider whether the application of electrocution in Florida is infected with "an element of cruelty."
Hamblen v. Dugger, 748 F.Supp. 1498, 1504 (M.D.Fla.1990). The Tafero, Medina, and Davis executions have now established a pattern of impermissible violence and mutilation.[37]
*436 It is clear on the record before this Court that execution by electrocution as carried out in Florida is not limited to "the mere extinguishment of life" as required under Kemmler, for this method of execution entails undue violence and mutilation. This is particularly clear in light of the continuingand apparently unavoidable mishaps involving Florida's electric chair. The punishment that is actually meted out by DOC officials differs in kind from the simple sentence of death that the constitution permits and that was recommended by the penalty phase juries and ordered by the courts. Execution by electrocution as administered by DOC in Florida violates Kemmler.

B. Electrocution Violates Evolving Standards of Decency
Execution by electrocution as administered in Florida also violates the "evolving standards of decency" criterion for several reasons. First, this practice, which was inaugurated in New York more than a century ago as a humane alternative to hanging, has been abandoned by scores of states and is now the sole method of execution in only three other states.
Electrocution was first adopted by a state as a method of execution in 1888 and last adopted in 1949, at which time twenty-six states used it; since 1949 (i.e., almost half a century ago), no state has adopted electrocution and twenty states have dropped it; of thirty-eight states that currently authorize execution, only six (Alabama, Florida, Georgia, Kentucky, Nebraska, and Tennessee) require electrocution; of these six, two (Kentucky and Tennessee) have not executed any prisoners since the United States Supreme Court lifted its ban on capital punishment in 1976; four additional states (Arkansas, Ohio, South Carolina, and Virginia) offer electrocution as an option; of these four, one (Ohio) has not executed any prisoners since 1976....
Jones, 701 So.2d at 87 (Shaw, J., dissenting).[38]
Second, execution by electrocution is practiced in no other country in the world:
[O]f approximately 140 countries outside the United States that impose capital punishment, none impose electrocution; in short, only four governments in the entire world (Alabama, Florida, Georgia, and Nebraska) impose electrocution exclusively....
Id. (emphasis omitted). As a postscript, I note that both the Humane Society of the United States and the American Veterinarian Medical Association condemn electrocution as a method of euthanasia for animals. See id. Third, other less cruel methods of execution are available; lethal injection is readily available (it has already been approved by the Florida Legislature[39]) and is generally considered more humane.[40]
And finallyand most tellingthe governmental body charged with oversight of Florida's execution apparatus, the Florida Corrections Commission,[41] has recommended that Florida switch from electrocution to lethal injection. In the wake of the botched executions of Tafero and Medina, the Commission undertook an exhaustive *437 survey of execution methods in other states and reported to the Governor and Legislature:
We found that almost all states have written procedures regarding the execution process, and that numerous states had recently changed to lethal injection from electrocution because it was considered to be a "more humane method of execution." While the report notes problems encountered in the past with almost all methods of execution, including lethal injection, the Commission recommends that Section 922.10, Florida Statutes, be amended to allow lethal injection as an alternative method of execution, in addition to electrocution, for those persons currently on a sentence of death. Furthermore, for persons whose crimes are committed on or after the effective date of such legislation, lethal injection would be the only method of execution, thereby "phasing out" the use of the electric chair in Florida.
The Florida Corrections Commission believes that Florida has an obligation to ensure that modern technologies keep pace with the level of competence in this area, and, just as changes have occurred in Florida's past in carrying out the death penalty, changes should again occur.
Jones, 701 So.2d at 82 (Kogan, C.J., dissenting) (quoting letter from commission chairman) (emphasis omitted and added). Unfortunately, unlike the New York Legislature a century ago in Kemmler, the Florida Legislature has failed to heed the state's own experts and switch to the more humane method.

VI. SOLE METHOD OF EXECUTION
Section 922.10, Florida Statutes (1997), provides that a death sentence in Florida shall be carried out by electrocution:
922.10 Execution of death sentence; executioner.A death sentence shall be executed by electrocution. The warden of the state prison shall designate the executioner.... The warrant authorizing the execution shall be read to the convicted person immediately before execution.
§ 922.10, Fla. Stat. (1997). The statutory scheme makes no provision for an alternative method of execution, unless electrocution is declared unconstitutional.[42]
Because electrocution is the sole means of execution approved for use at this time in Florida, the constitutional infirmities inherent in this method cannot be avoided by the availability of a more humane alternative:
Florida's electric chair, by its own track record, has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber of Florida State Prison. Because electrocution is the sole means of execution approved for use in Florida, the legislature has, so to speak, placed all its constitutional eggs in this one basket. As a result, any infirmity in this method cannot be mitigated at this time by the presence of an acceptable alternative. Such an all-or-nothing approach has proved fatal to the capital sentencing scheme in other states.
Jones, 701 So.2d at 87-88 (Shaw, J., dissenting).
Both the California and Washington legislatures attempted to circumvent this same problem by implementing a death penalty scheme that offered capital defendants a choice in method of execution. California's statutory scheme originally offered a choice in method (lethal gas or injection) but called for the default to fall to lethal gas.[43] After the federal circuit court declared the original scheme unconstitutional *438 under the federal Cruel and Unusual Punishments Clause because lethal gas is impermissibly cruel,[44] the state sought review in the United States Supreme Court. The California legislature promptly amended the statute to allow the default to fall to lethal injection.[45] Based on this legislative action, the United States Supreme Court vacated the circuit court decision and remanded for reconsideration.[46] Subsequently, a different capital defendant elected to be executed by lethal gas and then challenged that method anew. The circuit court reaffirmed its earlier ruling that execution by lethal gas is unconstitutional and enjoined the execution.[47]
In the State of Washington, the legislature took a similar tack when confronted with an adverse court ruling concerning its official method of executiondeath by hanging. The Washington scheme originally had offered a choice (death by hanging or lethal injection), with the default falling to death by hanging.[48] After the federal district court ruled that hanging was unconstitutional if applied to an inmate who was obese,[49] the state appealed. The Washington Legislature promptly amended the statute to allow the default to fall to lethal injection, and the federal circuit court dismissed the appeal as moot.[50]

VII. LETHAL INJECTION
Although electrocution has been the sole method of execution in this state since 1924, the legislature recently passed legislation that does two things: (1) It provides that no sentence of death shall be reduced if a method of execution is declared unconstitutional; and (2) it authorizes the use of lethal injection if electrocution is declared unconstitutional.
Section 775.082(2), Florida Statutes (1997),[51] has been amended to provide that no sentence of death shall be reduced to life if a method of execution is held to be unconstitutional:
775.082 Penalties; applicability of sentencing structures; mandatory minimum sentences for certain reoffenders previously released from prison.

*439 (1) A person who has been convicted of a capital felony shall be punished by death if the proceeding held to determine sentence according to the procedure set forth in s. 921.141 results in findings by the court that such person shall be punished by death, otherwise such person shall be punished by life imprisonment and shall be ineligible for parole.
(2) In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1). No sentence of death shall be reduced as a result of a determination that a method of execution is held to be unconstitutional under the State Constitution or the Constitution of the United States.

§ 775.082(1)-(2), Fla. Stat. (Supp.1998) (emphasis added).
Although section 922.10, Florida Statutes (1997) (calling for execution by electrocution),[52] remains unchanged, chapter 922 has been amended to provide that if electrocution is held to be unconstitutional, then all capital defendants shall be executed by lethal injection:
922.105 Execution of death sentence by lethal injection if death by electrocution is declared unconstitutional; prohibition against reduction of death sentence as a result of determination that a method of execution is unconstitutional.
(1) A death sentence shall be executed by electrocution pursuant to s. 922.10. If electrocution is held to be unconstitutional by the Florida Supreme Court under the State Constitution, or held to be unconstitutional by the United States Supreme Court under the United States Constitution, or if the United States Supreme Court declines to review any judgment holding electrocution to be unconstitutional under the United States Constitution made by the Florida Supreme Court or the United States Court of Appeals that has jurisdiction over Florida, all persons sentenced to death for a capital crime shall be executed by lethal injection.

(2) The provisions of the opinion and all points of law decided by the United States Supreme Court in Malloy v. South Carolina, 237 U.S. 180[, 35 S.Ct. 507, 59 L.Ed. 905] (1915), finding that the Ex Post Facto Clause of the United states Constitution is not violated by a legislatively enacted change in the method of execution for a sentence of death validly imposed for previously committed capital murders, are adopted by the Legislature as the law of this state.
(3) A change in the method of execution does not increase the punishment or modify the penalty of death for capital murder. Any legislative change to the method of execution for the crime of capital murder does not violate s. 10, Art. I or s. 9, Art X of the State Constitution.
. . . .
(6) Notwithstanding s. 775.082(2), s. 775.15(1)(a), or s. 790.161(4), or any other provision to the contrary, no sentence of death shall be reduced as a result of a determination that a method of execution is declared unconstitutional under the State Constitution or the Constitution of the United States. In any case in which an execution method is declared unconstitutional, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.
*440 § 922.105, Fla. Stat. (Supp.1998) (emphasis added).
The question posed in the present case is whether retroactive application of these statutory changes violates ex post facto principles. I conclude that it does not, based on Malloy v. South Carolina, 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905 (1915). There, South Carolina sought to apply its newly enacted method of execution, electrocution, to a defendant whose crime had been committed before the effective date of the new statute. The statute in effect at the time of the crime had called for death by hanging. The United States Supreme Court held that retroactive application of the more humane method of execution did not violate ex post facto concerns. I would apply Malloy to the present case and allow Provenzano's sentence to be carried out by lethal injection.[53]

VIII. CONCLUSION
Execution by electrocutionwith its attendant smoke and flames and blood and screamsis a spectacle whose time has passed. The fiery deaths of Jesse Tafero and Pedro Medina and the recent bloody execution of Allen Lee Davis are acts more befitting a violent murderer than a civilized state. The color photos of Davis depict a man whofor all appearances was brutally tortured to death by the citizens of Florida. Violence begets violence, and each of these deaths was a barbaric spectacle played by the State of Florida on the world stage. Each botched execution cast the entire criminal justice system of this stateincluding the courtsin ignominy.
The United States Constitution stands before the world not as a dark testament to wanton, state-sponsored violence and mutilation, but ratherin the spirit of the founding fathersas an enduring beacon of light and hope and justice. The United States Supreme Court has ruled that a principal purpose of the Cruel and Unusual Punishments Clause is
to protect the dignity of society itself from the barbarity of exacting mindless vengeance.
Ford v. Wainwright, 477 U.S. 399, 410, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). Our Constitutionthis nation's sacred charter abides as a paragon of all that is good and decent in the law, a shining example for the world to follow.
Only three other states in the union Alabama, Georgia and Nebraskacontinue to follow Florida's lead in requiring electrocution as the sole means of execution. Scores of states have abandoned this practice. No other country in the world uses electrocution as a means of execution. The State's own preeminent experts in this fieldi.e., DOC's advisory committee have recommended that Florida forsake *441 this outdated practice in favor of lethal injection. There comes a time when the Constitution must say "enough is enough."
I would direct that the sentence in the present case be carried out by lethal injection as prescribed by statute.
ANSTEAD, J., concurs.
(POST-EXECUTION PHOTOS OF ALLEN LEE DAVIS ARE APPENDED TO THIS DISSENTING OPINION OF SHAW, J.)
*442 
*443 
*444 
ANSTEAD, J., dissenting.
I concur in the scholarly opinions of Justice Shaw and Justice Pariente. I also commend the opinion of Chief Justice Harding which, while contrary to my own on the constitutional issues in question, makes *445 out a compelling case for abandoning electrocution as a method of enforcing the death penalty.
The views of the Chief Justice, Justice Shaw, and Justice Pariente are deeply rooted in the jurisprudence of the U.S. Supreme Court and of this Court. Perhaps no jurist has more eloquently made the same point than our own Justice Ervin in his dissenting opinion in this Court's landmark case of State v. Dixon:
The nation's highest court recognizes we have come a long way from the rack, the "drawing and quartering," the headsman's axe, the public executions, the "hanging judge"-from cruel and unusual punishments. We can little afford to turn back because it is clear to thinking people that brutality and cruelty at the hands of government soils the fabric of an enlightened nation. Governments are constantly under scrutiny-constantly gauged by a nation's thinking people in terms of whether they are enlightened and humane; of whether they are still instruments of oppression, perpetuators of archaic punishments to allay the fears and passions of privileged groups.
State v. Dixon, 283 So.2d 1, 23 (Fla.1973) (Ervin, J., dissenting). Justice Ervin's words seem perfectly suited to today's debate on whether the continuing use of the electric chair constitutes cruel or unusual punishment. His words also strike a chilling chord today because we are presented with a record and graphic evidence, including photographs, of the horror of Florida's most recent use of the electric chair.

CRUEL OR UNUSUAL
An obvious failing of the majority opinion is its apparent unwillingness to directly confront and explain the Florida Constitution's prohibition of cruel or unusual punishments and the ban of cruel and unusual punishments in the U.S. Constitution.[54] If the majority did so it would surely have to conclude that at the very least punishing someone by the direct application of lethal doses of electricity to various parts of the body is a highly unusual method of punishment, whether considered years ago when our constitutions were approved, or considered today. In fact, the United States Supreme Court has quoted with approval an opinion of the New York Court of Appeals characterizing electrocution as "certainly unusual". In re Kemmler, 136 U.S. 436, 443-44, 10 S.Ct. 930, 34 L.Ed. 519 (1890). Electrocution is simply not a "usual" form of punishment, and it cannot somehow be made "usual" by its continued use. If we were to allow an "unusual" punishment to become "usual" simply by its repeated usage then we simply would be editing out the ban on unusual punishments in the Florida Constitution.
Determining whether electrocution is a cruel punishment requires more analysis. Arguably, for example, electrocution may not have been considered cruel when it was first introduced in the nineteenth century, because it was then compared to death by hanging and considered more humane than hanging. In fact, the U.S. Supreme Court expressly relied upon findings that electrocution would be more humane *446 than hanging in refusing to interfere with New York's decision to abandon hanging (as a barbaric practice from the dark ages) in favor of the more humane electrocution. In re Kemmler. Based on the prevailing culture and knowledge at the time, and the urgency to do away with hanging, it is easy to understand why electrocution may not have been considered constitutionally cruel. However, just as electrocution may have been originally evaluated in comparison with hanging, we know today that the overwhelming majority of death penalty jurisdictions have long since rejected use of the electric chair and have turned to lethal injection as a more humane punishment.
As noted above, In re Kemmler was decided in the context of a state's attempt to find a more humane means of death than hanging. However, it is also important to note that the case was decided before electrocution had actually been used. Because we know that lethal injection provides a more humane alternative, and, because we now know from actual experience that electrocution always involves mutilation (within and without the body) and a substantial risk of malfunction (including external burning, bleeding, asphyxiation, etc.), as well as a culture of cruelty ("burn `em", "fry `em"), it is apparent that electrocution has become a cruel and senseless punishment, especially when evaluated in light of our evolving standards of decency. Hopefully, just as those who reflected back on the history of hanging at the close of the nineteenth century and concluded it was inhumane, we now, at the close of the twentieth century, have an even more informed and enlightened view of acceptable punishments upon which to evaluate death by electrocution.
In Justice Shaw's opinion he again notes that for humane reasons we as a society have rejected the use of electrocution even for the killing of animals. That simple but eloquent observation perhaps speaks more directly to the heart of the issue before us than any other argument. In effect, we have found the killing of animals by electrocution to be inhumane and uncivilized. We know, as the State has candidly conceded, that the entire process of death by electrocution is at least "somewhat ghastly". We also know, as aptly explained by Chief Justice Harding, that a more humane means of taking life is readily available to the State. Under those circumstances, our continuing embrace of a savage and inhumane means of taking life does a disservice to our justice system and our society.[55]
SHAW, J., concurs.
PARIENTE, J., dissenting.
I write to explain the reasons I am compelled to dissent in this case. The subject of the debate presented by this case is not whether the death penalty is a constitutionally permissible punishment for those in this State who commit the most aggravated and least mitigated crimes, *447 such as Allen Lee Davis and Thomas Provenzano. Thus, this case does not have to do with the legislative prerogative to specify the punishment for the crimewhether it be death, life in prison, or a sentence of a definite number of years in prison.
Rather, the subject of the legal debate before this Court solely concerns the scope of the legislative prerogative to select one method of execution over another. Thus, the issue in this case is not whether Provenzano should be executed; only how he should be executed.[56] It is without question that the legislative prerogative to choose a given method of execution must be judged by the prohibition against the infliction of cruel and unusual punishment found in the Florida and federal constitutions. See U.S. Const., amend. VIII; art. I, § 17, Fla. Const.
As the United States Supreme Court stated in Wilkerson v. Utah, 99 U.S. (9 Otto) 130, 133, 25 L.Ed. 345 (1878), although the legislative branch may define crimes and "prescribe the punishment of the offenders," this power is "subject to the prohibition of the Constitution that cruel and unusual punishments shall not be inflicted." (Emphasis supplied.) Almost one hundred years later, this principle was reiterated: "It seems conceded by all that the Amendment imposes some obligations on the judiciary to judge the constitutionality of punishment and that there are punishments that the Amendment would bar whether legislatively approved or not." Gregg v. Georgia, 428 U.S. 153, 174, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (quoting Furman v. Georgia, 408 U.S. 238, 313-14, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (White, J., concurring)).[57]
"[T]he Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a challenged punishment, guided by "objective factors to the maximum possible extent." Coker v. Georgia, 433 U.S. 584, 592, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion). Thus, the Court must exercise its own judgment as to whether a method of execution is cruel and unusual in order to enforce the requirement of the Eighth Amendment that cruel and unusual punishment not be inflicted.
To determine whether electrocution constitutes cruel and unusual punishment, we must first consider what the United States Supreme Court has considered to be the purpose and scope of the Eighth Amendment's prohibition against cruel and unusual punishment. As explained in Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Eighth Amendment must draw its "meaning from the evolving standards of decency that mark the progress of a maturing society."
*448 Perhaps the most concise discussion of the scope of the Eighth Amendment is set forth in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976):
It suffices to note that the primary concern of the drafters [of the Eighth Amendment] was to proscribe "torture(s)" and other "barbar(ous)" methods of punishment. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment....
Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...," against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society" or which "involve the unnecessary and wanton infliction of pain."

Id. at 102, 97 S.Ct. 285 (citations omitted) (emphasis supplied). This clause has an "expansive and vital character." Glass v. Louisiana, 471 U.S. 1080, 1083, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting from denial of certiorari) (quoting Weems v. United States 217 U.S. 349, 377, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). "[T]he Amendment has been interpreted in a flexible and dynamic manner." Gregg, 428 U.S. at 171, 96 S.Ct. 2909. As concepts of civility and dignity evolve, so do the limits of what constitutes cruel and unusual punishment. See Dulles, 356 U.S. at 100, 78 S.Ct. 590. Accordingly, Eighth Amendment issues must be evaluated "in light of contemporary human knowledge," Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), rather than "in reliance on century-old factual premises that may no longer be accurate." Glass, 471 U.S. at 1083, 105 S.Ct. 2159 (Brennan, J., dissenting from denial of certiorari). These broad statements of constitutional principles apply with equal force to determine the legality of a method of execution. See Campbell v. Wood, 511 U.S. 1119, 1121, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994) (Blackmun, J., dissenting from denial of certiorari) (explaining that the United States Supreme Court has never "distinguished between challenges to the proportionality and method of capital punishment").
In holding that the absence of conscious pain after the electrical current is administered ends the judicial inquiry into whether electrocution is unconstitutional, the majority decision in this case relies on our opinion in Jones v. State, 701 So.2d 76, 79 (Fla.1997), cert. denied, 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998). Jones in turn cites to Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Louisiana ex. rel Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), and Campbell v. Wood, 18 F.3d 662 (9th Cir.1994). However, no such narrow and conclusive statement can be derived from those cases.
The fact that the method of execution may result in instantaneous death, while an important factor to consider, does not end the judicial inquiry into whether the method of punishment is cruel and unusual. Analyzing the constitutionality of punishment under the Eighth Amendment, the Supreme Court in Gregg also stated that a "penalty also must accord with `the dignity of man,' which is the `basic concept underlying the Eighth Amendment.'" 428 U.S. at 173, 96 S.Ct. 2909 (quoting Dulles, 356 U.S. at 100, 78 S.Ct. 590).
Further, the Campbell decision relied on the following statement in Glass:
What are the objective factors by which courts should evaluate the constitutionality of a challenged method of punishment? First and foremost, the Eighth Amendment prohibits "the unnecessary and wanton infliction of pain." Gregg v. Georgia, supra, at 173[, 96 *449 S.Ct. 2909], (opinion of Stewart, Powell, and Stevens, JJ.). See also Coker v. Georgia, supra, at 592[, 97 S.Ct. 2861], (plurality opinion) (a punishment is excessive if it is "nothing more than the purposeless and needless imposition of pain and suffering"); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463[, 67 S.Ct. 374, 91 L.Ed. 422] (1947) ("The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence"). The Court has never accepted the proposition that notions of deterrence or retribution might legitimately be served through the infliction of pain beyond that which is minimally necessary to terminate an individual's life.

Glass, 471 U.S. at 1084, 105 S.Ct. 2159 (Brennan, J., dissenting from denial of certiorari) (emphasis supplied), cited in Campbell, 18 F.3d at 682. However, Campbell failed to cite to the remainder of Justice Brennan's explanation in Glass that the contours of the Eighth Amendment extend beyond whether there is conscious pain inherent in the method of execution:
The Eighth Amendment's protection of "the dignity of man," Trop v. Dulles, supra, at 100[, 78 S.Ct. 590], (plurality opinion), extends beyond prohibiting the unnecessary infliction of pain when extinguishing life. Civilized standards, for example, require a minimization of physical violence during execution irrespective of the pain that such violence might inflict on the condemned. See, e.g., Royal Commission on Capital Punishment, 1949-1953 Report ¶ 732, p. 255 (1953) (hereinafter Royal Commission Report). Similarly, basic notions of human dignity command that the State minimize "mutilation" and "distortion" of the condemned prisoner's body. Ibid. These principles explain the Eighth Amendment's prohibition of such barbaric practices as drawing and quartering. See, e.g., Wilkerson v. Utah, supra, at 135.
Glass, 471 U.S. at 1085, 105 S.Ct. 2159 (Brennan, J., dissenting from denial of certiorari). Thus, the Eighth Amendment also requires that the method of execution minimize physical violence as well as mutilation and distortion of the human body.
Therefore, my conclusion differs from the majority because I fail to see how United States Supreme Court precedent allows us to limit our constitutional inquiry to the presence or absence of conscious pain. Even the concurring opinion of Justice Quince recognizes that the "real question" is whether electrocution violates the "evolving standards of decency." Concurring opinion of Quince, J., at 420. In apparent recognition that the constitutional inquiry is not so limited, the State conceded in oral argument that the guillotine would not pass constitutional muster today, even though it most likely results in an instantaneous death without the defendant suffering conscious pain.
No one seriously disagrees that as of the end of the twentieth century, lethal injection is a more humane method of execution and creates far less a spectacle than electrocution. It is less physically violent and minimizes mutilation of the body. No one seriously disagrees that electrocution was originally selected by the State of New York in 1885 in lieu of hanging because at that time the executive and legislative branches affirmatively determined that electrocution was the "most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases." In re Kemmler, 136 U.S. 436, 444, 10 S.Ct. 930, 34 L.Ed. 519 (1890). There is no indication that the legislative decision in 1999 to retain electrocution, contrary to the recommendations of the Florida Corrections Commission, was based on objective evidence that this method was more humane than lethal injection or other alternative methods.[58]
*450 The Legislature does not have the prerogative to select a method of execution that is inherently cruel, violent and mutilating when more humane methods exist. The State's only legitimate interest is in the extinguishment of life. Indeed, the State has not made the argument in this case that the Legislature has the "right" to make the execution more violent and more cruel than necessary to extinguish the lives of those sentenced to death.
In determining whether electrocution comports with "evolving standards of decency," we should consider the fact the Florida Corrections Commission recommended that the electric chair be phased out as a method of execution in favor of lethal injection because it "believes that Florida has an obligation to ensure that modern technologies keep pace with the level of competence in this area, and, just as changes have occurred in Florida's past in carrying out the death penalty, changes should again occur." Jones, 701 So.2d at 82 (Kogan, C.J., dissenting) (quoting Florida Corrections Comm'n, Supplemental Report on Execution Methods Used by States (1997)).
We cannot ignore the objective evidence that almost every state that authorizes the death penalty has either selected or changed its method to lethal injection some in response to the botched executions of Medina and Tafero. While the fact that only three other states (Georgia, Alabama, and Nebraska[59]) retain electrocution as the sole method of execution is not determinative of the constitutional question, this fact bears on the exercise of the Court's judgment as to whether the method of punishment violates contemporary standards of decency. See Gregg, 428 U.S. at 172-76, 96 S.Ct. 2909.
In addition, we must look at the actual experience in recent years with the electric chair. Recent executions have revealed one problem after another.[60] Flames spewed from the heads of Medina and Tafero. See Jones, 701 So.2d at 85-86. The cause was found to be an improper sponge. See id. at 86. After two flaming executions, the sponges were replaced and the flames ceased. However, it is undisputed that despite all of the best efforts, electrocution will result in burning of parts of the body. In fact, all of the inmates in the last executions have sustained outward burns to their bodies. Thus, burning is inherent in the method of the execution.
It is undisputed that, despite all best efforts, inmates have been observed breathing after the electric current has ceased. This indicates that brain stem activity has continued even after the application of electrical current. Now with the last execution, there is a serious question as to whether the mouth piece partially asphyxiated Davis, which resulted in bloody side showa spectacle more befitting of a "B" Hollywood horror movie than a state-sanctioned execution.
Although a factual finding has been made by two different circuit court judges that Florida's electric chair causes no conscious pain, these factual findings need only be made by a preponderance of the evidence. Despite our deferential standard of review to trial court's factual findings, the expert testimony submitted by *451 Provenzano and the witness accounts of survival after electrocution raise serious questions that judicial electrocution does in fact involve conscious pain and suffering. See generally Glass, 471 U.S. at 1086-87, 105 S.Ct. 2159 (Brennan, J., dissenting from denial of certiorari) ("There is considerable empirical evidence and eyewitness testimony ... [that] suggests that death by electrical current is extremely violent and inflicts pain and indignities far beyond the `mere extinguishment of life.'"). We cannot simply ignore this evidence.
As Justice Brennan observed, "[I]t is firmly within the `historic process of constitutional adjudication' for courts to consider, through a `discriminating evaluation' of all available evidence, whether a particular means of carrying out the death penalty is `barbaric' and unnecessary in light of currently available alternatives." Id. at 1084, 105 S.Ct. 2159 (quoting Furman, 408 U.S. at 420, 92 S.Ct. 2726 (Powell, J., dissenting)) (emphasis supplied).[61] All of this leads to the conclusion that this method of execution does not comport with "evolving standards of decency," Trop, 356 U.S. at 101, 78 S.Ct. 590, based on an evaluation of "objective factors." Coker, 433 U.S. at 592, 97 S.Ct. 2861.
"The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." Resweber, 329 U.S. at 464, 67 S.Ct. 374 (emphasis supplied). Certainly, knowledge of death involves fear, which is inevitable with all impending executions. However, all of the other troubling aspects of recent electrocutionsthe flames, the blood, the screams, the burning, and the resulting spectacle of the actual execution indicate to me that there is cruelty, violence and mutilation inherent in this method of execution.
In enacting the Eighth Amendment, the founders of this Nation determined that, as a civilized nation, we would not allow the State to become the instrument of cruelty and violence in the methods chosen to punish those who violated the law. This enduring constitutional principle applies no matter how great our desire as individuals for vengeance and no matter how cruel, how ghastly, or how violently the innocent victims died.
We do not have to wait another fifty years to determine that in 1999, electrocution is not only unusual, since only three states including Florida currently execute its death-sentenced offenders solely by electrocution, but it is also inherently cruel as involving mutilation and violence. Electrocution, as a method of carrying out the State's legitimate interest in imposing the ultimate penalty of death, has become incompatible with the concepts of "dignity, civilized standards, humanity, and decency" that embody the essence of the Eighth Amendment. Estelle, 429 U.S. at 102, 97 S.Ct. 285. History and this Court's recent experience with the electric chair all point to this inevitable conclusion. Just as the guillotine, public hanging and death by firing squad would be deemed barbaric relics of another era, so must electrocution be declared unconstitutional as violative of the Eighth Amendment's clear prohibition that cruel and unusual punishment not be inflicted.
ANSTEAD, J., concurs.
NOTES
[1] Provenzano claims that the circuit court erred in ruling that the testimony of two potential witnesses (Thomas Crapps and Richard Martell) was precluded. Provenzano also claims that the circuit court erred in sustaining the State's objections to questions concerning certain testimony from witnesses Rabbani Muhammed and A.D. Thornton.
[2] This supposed more "humane" method of execution has come under Eighth Amendment attack and I suspect will generate even more litigation over the next few years. See Hunt v. Smith, 856 F.Supp. 251 (D.Md.1994), aff'd sub nom. Hunt v. Nuth, 57 F.3d 1327 (4th Cir.1995).
[3] Only one state, Utah, uses the firing squad as its method of judicial execution.
[4] The use of electrocution as the sole method of judicial execution is now used in only four states: Alabama, Georgia, Florida and Nebraska.
[5] Lethal gas as a judicial method of execution is provided for in several states, including: Missouri and North Carolina. Both Maryland and California have now changed to lethal injection as the method of execution.
[6] Hanging as a method of execution takes place in only Washington and Montana, and in both states, lethal injection can be chosen by the defendant.
[7] In Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir.1995), the circuit court did not address, based on mootness grounds, the defendant's argument that execution by lethal injection violated the Eighth Amendment prohibition against cruel and unusual punishment because lethal injection violated federal drug laws and could inflict cruel and inhumane treatment as a result of botched executions.
[8] The district court in Fierro v. Gomez, 865 F.Supp. 1387 (N.D.Cal.1994), vacated sub nom. Fierro v. Terhune, 147 F.3d 1158 (9th Cir.1998), declared unconstitutional the California statute that required or permitted execution by lethal gas.
[9] See Jones v. State, 701 So.2d 76 (Fla.1997), cert. denied, 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998).
[10] See § 922.105(1), Fla. Stat. (Supp.1998) ("If electrocution is held to be unconstitutional... all persons sentenced to death for a capital crime shall be executed by lethal injection.").
[11] See Jones v. Butterworth, 691 So.2d 481, 482 (Fla.1997) ("The claim that execution by electrocution is unconstitutional per se is hereby denied as procedurally barred as it could have been raised in previous petitions for relief." (Emphasis added.)).
[12] See, e.g., White v. State, 729 So.2d 909, 911 & n. 4 (Fla.1999)(rejecting the constitutionality issue "as without merit"); Remeta v. State, 710 So.2d 543, 546 (Fla.)(stating that defendant was entitled to "no relief" on the constitutionality issue), cert. denied, 523 U.S. 1055, 118 S.Ct. 1383, 140 L.Ed.2d 526 (1998); Elledge v. State, 706 So.2d 1340, 1347 & n. 9 (Fla.1997)(stating that the constitutionality issue had "already been decided adversely to Elledge"), cert. denied, ___ U.S. ___, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998); Pooler v. State, 704 So.2d 1375, 1381 (Fla.1997)(noting that the claim had been "previously rejected... as meritless"), cert. denied, ___ U.S. ___, 119 S.Ct. 119, 142 L.Ed.2d 96 (1998); Hoskins v. State, 702 So.2d 202, 208 (Fla.1997)(rejecting the claim as "without merit" and noting the claim had been "repeatedly rejected" by this Court); Consalvo v. State, 697 So.2d 805, 811-12 (Fla.1996)(noting that the claim had been "previously rejected by this Court and do[es] not require additional discussion"), cert. denied, 523 U.S. 1109, 118 S.Ct. 1681, 140 L.Ed.2d 819 (1998); Hunter v. State, 660 So.2d 244, 253 (Fla.1995)(ruling that the issue was procedurally barred, but even if not barred the issue had been rejected previously); Fotopoulos v. State, 608 So.2d 784, 794 & n. 7 (Fla.1992)(finding that the claim was procedurally barred, but even if not barred the claim "lack[ed] merit").
[13] Prior to Kemmler, the United States Supreme Court addressed (with approval) shooting as a method of execution in the Territory of Utah. See Wilkerson v. Utah, 99 U.S. (9 Otto) 130, 25 L.Ed. 345 (1878).
[14] See generally Poyner v. Murray, 508 U.S. 931, 933, 113 S.Ct. 2397, 124 L.Ed.2d 299 (1993) (Souter, J., joined by Blackmun and Stevens, JJ., dissenting from denial of certiorari) ("The Court has not spoken squarely on the underlying issue since In re Kemmler, and the holding of that case does not constitute a dispositive response to litigation of the issue in light of modern knowledge about the method of execution in question."). I note that Kemmler was decided on a limited evidentiary basisno one had yet been executed by electrocution.
[15] The Cruel and Unusual Punishments Clause was inapplicable to the states at that time. See Kemmler, 136 U.S. at 446, 10 S.Ct. 930; see also Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (extending the Eighth Amendment to the states via the Fourteenth Amendment).
[16] Justice Brennan addressed this issue in Glass v. Louisiana, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985), reaffirming the Kemmler standard:

The Court has never accepted the proposition that notions of deterrence or retribution might legitimately be served through the infliction of pain beyond that which is minimally necessary to terminate an individual's life. Thus in explaining the obvious unconstitutionality of such ancient practices as disembowelling while alive, drawing and quartering, public dissection, burning alive at the stake, crucifixion, and breaking at the wheel, the Court has emphasized that the Eighth Amendment forbids "inhuman and barbarous" methods of execution that go at all beyond "the mere extinguishment of life" and cause "torture or a lingering death." It is beyond debate that the Amendment proscribes all forms of "unnecessary cruelty" that cause gratuitous "terror, pain, or disgrace."
Glass, 471 U.S. at 1084, 105 S.Ct. 2159 (Brennan, J., dissenting from denial of certiorari) (citation and footnote omitted); see also Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("[T]he punishment must not involve the unnecessary and wanton infliction of pain.").
[17] See generally Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 91 L.Ed. 422 (1947) ("The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely.").
[18] The United States Court of Appeals, Ninth Circuit, described the effects of lethal gas as applied in California:

[I]nmates who are put to death in the gas chamber at San Quentin do not become immediately unconscious upon the first breath of lethal gas.... [A]n inmate probably remains conscious anywhere from 15 seconds to one minute, and ... there is a substantial likelihood that consciousness, or a waxing and waning of consciousness, persists for several additional minutes. During this time, ... inmates suffer intense, visceral pain, primarily as a result of lack of oxygen to the cells. The experience of "air hunger" is akin to the experience of a major heart attack, or to being held under water. Other possible effects of the cyanide gas include tetany, an exquisitely painful contraction of the muscles, and painful build-up of lactic acid and adrenaline. Cyanide-induced cellular suffocation causes anxiety, panic, terror, and pain.
Fierro v. Gomez, 77 F.3d 301, 308 (9th Cir.)(quoting Fierro v. Gomez, 865 F.Supp. 1387, 1404 (N.D.Cal.1994)), vacated and remanded for reconsideration, 519 U.S. 918, 117 S.Ct. 285, 136 L.Ed.2d 204 (1996), remanded, Fierro v. Terhune, 147 F.3d 1158 (9th Cir. 1998).
[19] See generally Kristina E. Beard, Comment, Five Under the Eighth: Methodology Review and the Cruel and Unusual Punishments Clause, 51 U. Miami L.Rev. 445, 465 (1997) ("By most accounts, lethal injection involves minimal pain, and there is little apparent violence or bodily mutilation.").
[20] See also Campbell v. Wood, 511 U.S. 1119, 114 S.Ct. 2125, 2127, 128 L.Ed.2d 682 (1994) (Blackmun, J., dissenting from denial of certiorari) ("[P]ainless, post mortem punishments such as public display, drawing and quartering, and mutilation also violate the Eighth Amendment."); Rupe v. Wood, 863 F.Supp. 1307, 1315 (W.D.Wash.1994) ("Supreme Court cases discussing the history of the Eighth Amendment make clear that decapitation and similar mutilation, even if accomplished after death and thus perhaps without `unnecessary and wanton infliction of pain,' offend basic human dignity."); Thomas v. Jones, 742 F.Supp. 598, 603 (S.D.Ala.1990) ("Every case the Court reviewed dealing with electrocution acknowledged that painful electrocution, or excessive burning and mutilation might violate the Eighth Amendment." (Emphasis added.)).
[21] See generally Robert J. Sech, Note, Hang `Em High: A Proposal for Thoroughly Evaluating the Constitutionality of Execution Methods, 30 Val. U.L.Rev. 381 (1995).
[22] See Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910) ("In the application of a constitution, therefore, our contemplation cannot be only of what has been, but of what may be.").
[23] The Court in Trop held that forced relinquishment of citizenship as punishment for misconduct while in the military violates the Eighth Amendment.
[24] See, e.g., Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that it is not cruel and unusual to execute the mentally retarded); Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (holding that it is cruel and unusual to execute the insane); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding the death penalty disproportionately cruel and unusual when imposed for aiding and abetting a robbery resulting in murder); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (holding the death penalty disproportionately cruel and unusual when imposed for the crime of rape).
[25] See, e.g., Coker.
[26] See, e.g., Trop.
[27] Justice Powell noted the following in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972):

Neither the Congress nor any state legislature would today tolerate pillorying, branding, or cropping or nailing of the ears punishments that were in existence during our colonial era. Should, however, any such punishment be prescribed, the courts would certainly enjoin its execution. Likewise, no court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives.
Id., 408 U.S. at 430, 92 S.Ct. 2726 (Powell, J., dissenting) (citation and footnote omitted) (emphasis added). Justice Powell's views in Furman were largely adopted by the Court in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
[28] In two additional cases, the federal circuit court reviewed a method of execution but did not conduct an in-depth constitutional analysis. In both cases, there had been no evidentiary hearing below, and the circuit court deferred to precedent approving the method under review. See Hunt v. Nuth, 57 F.3d 1327 (4th Cir.1995) (upholding lethal gas in Maryland); Gray v. Lucas, 710 F.2d 1048 (5th Cir.1983) (upholding lethal gas in Mississippi).
[29] Under the Washington scheme at that time, a defendant could choose the method of execution, either hanging or lethal injection, with the default falling to hanging. See Wash. Rev.Code 10.95.180(1) (1994). This statute was later amended to allow the default to fall to lethal injection. See Wash. Rev.Code 10.95.180(1) (1994).
[30] But see Rupe v. Wood, 863 F.Supp. 1307 (W.D.Wash.1994) (holding that execution by hanging under the Washington protocol presented a substantial risk of decapitation for Rupe, who was obese, and thus violated the Cruel and Unusual Punishments Clause). The district court's decision in Rupe was vacated on appeal after the Washington Legislature amended the statute (which offered a choice of methodhanging or lethal injectionwith the default falling to hanging) to allow the default to fall to lethal injection. See Rupe v. Wood, 93 F.3d 1434 (9th Cir.1996).
[31] Westley Allan Dodd was the only person to be executed by hanging in the United States since 1963. See Campbell, 18 F.3d at 700 (Reinhardt, J., dissenting).
[32] But see Campbell v. Wood, 511 U.S. 1119, 1120-21, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994) (Blackmun, J., dissenting) (contending that the Ninth Circuit should have conducted an analysis under the "evolving standards of decency" criterion).
[33] Under the California scheme at that time, a defendant could choose the method of execution, either lethal gas or injection, with the default falling to lethal gas. Cal.Penal Code § 3604(b) (West Supp.1995). This statute was later amended to allow the default to fall to lethal injection. Cal.Penal Code § 3604(b) (West Supp.1996).
[34] See generally Jones, 701 So.2d at 82-88 (Shaw, J., dissenting).
[35] The "mouth-strap" in fact appears to be a weight-lifter's belt or some such item. In the photos, the belt is turned backwards, so that the wide portion, which normally would support the back of the weight lifter, is placed over Davis' face. The belt is then run behind two wood rails at the back of the electric chair and buckled behind the chair.
[36] See Thomas v. Jones, 742 F.Supp. 598, 603 (S.D.Ala.1990) (acknowledging that excessive burning and mutilation during electrocution would implicate the Eighth Amendment).
[37] See also Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 471, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring) ("The fact that I reach this conclusion does not mean that a hypothetical situation, which assumes a series of abortive attempts at electrocution or even a single, cruelly willful attempt, would not raise different questions."); Squires v. Dugger, 794 F.Supp. 1568, 1580 (M.D.Fla.1992) ("Absent a showing establishing a pattern of malfunctions in the operation of the electric chair, the Court cannot conclude that unnecessary pain is being inflicted during executions in the Florida electric chair.").
[38] Both Kentucky and Tennessee have recently switched from electrocution to lethal injection as the official method of execution. See Ky.Rev.Stat. Ann. § 431.220 (Mitchie Supp. 1998); Tenn.Code Ann. § 40-23-114 (Supp. 1998).
[39] See § 922.105(1), Fla. Stat. (Supp.1998) ("If electrocution is held to be unconstitutional... all persons sentenced to death for a capital crime shall be executed by lethal injection.").
[40] See supra note 19.
[41] See § 20.315(6), Fla. Stat. (1997).
[42] See § 922.105, Fla. Stat. (Supp.1998) ("If electrocution is held to be unconstitutional... all persons sentenced to death for a capital crime shall be executed by lethal injection.").
[43] See Cal.Penal Code § 3604(b) (West Supp. 1995).
[44] See Fierro v. Gomez, 77 F.3d 301 (9th Cir. 1996).
[45] See Cal.Penal Code § 3604(b) (West Supp. 1996).
[46] Gomez v. Fierro, 519 U.S. 918, 117 S.Ct. 285, 136 L.Ed.2d 204 (1996). See also Fierro v. Terhune, 147 F.3d 1158 (9th Cir.1998) (holding on remand that because Fiero had not yet chosen to be executed by lethal gas, he lacked standing to challenge the constitutionality of that method of execution and the claim was not ripe for decision). Cf. Poland v. Stewart, 117 F.3d 1094 (9th Cir.1997) (holding that constitutional challenge to execution by lethal gas in Arizona was not ripe for decision because the defendant had not yet chosen that method of execution).
[47] LaGrand v. Stewart, 173 F.3d 1144 (9th Cir.1999).
[48] See Wash. Rev.Code 10.95.180(1) (1994).
[49] Rupe v. Wood, 863 F.Supp. 1307 (W.D.Wash.1994).
[50] See Wash. Rev.Code 10.95.180(1) (1998). See also Rupe v. Wood, 93 F.3d 1434 (9th Cir.1996) (vacating district court decision in light of subsequent legislative enactment).
[51] Prior to being amended, section 775.082, Florida Statutes (1997), provided as follows:

775.082 Penalties; mandatory minimum sentences for certain reoffenders previously released from prison.
(1) A person who has been convicted of a capital felony shall be punished by death if the proceeding held to determine sentence according to the procedure set forth in s. 921.141 results in findings by the court that such person shall be punished by death, otherwise such person shall be punished by life imprisonment and shall be ineligible for parole.
(2) In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1).
§ 775.082, Fla. Stat. (1997).
[52] Section 922.10, Florida Statutes (1997), provides as follows:

922.10 Execution of death sentence; executioner.A death sentence shall be executed by electrocution. The warden of the state prison shall designated the executioner.... The warrant authorizing the execution shall be read to the convicted person immediately before execution.
§ 922.10, Fla. Stat. (1997).
[53] I would recede from Washington v. Dowling, 92 Fla. 601, 109 So. 588 (1926), to the extent that it is inconsistent with this conclusion. There, the statute that was in effect at the time of the crime called for death by hanging, and the sentence imposed by the trial court specified death by hanging. Before Washington was executed, however, the Legislature enacted a law abolishing hanging and calling for death by electrocution. The Governor issued a warrant ordering that Washington be electrocuted. The trial court ruled the warrant void because it differed from the sentence imposed by the court. The Governor then issued a new warrant ordering death by hanging. Washington petitioned the trial court, claiming that he could not be hung because the new law had abolished hanging. The trial court rejected the claim. This Court affirmed. The Court reasoned that (1) the trial court's sentence calling for death by hanging was final and could not be changed, and (2) the portion of the new law abolishing hanging could not operate to allow Washington to evade the court-ordered punishment. The Court relied on the Savings Clause of article 3, section 32, Florida Constitution (1885), which provided that "the repeal or amendment of any criminal statute shall not affect the prosecution or punishment of any crime committed before such repeal or amendment." I would recede from that portion of Washington wherein the Court held that the sentence could not be carried out by electrocution. The Savings Clause thus would be inapplicable. See, e.g., State v. Watts, 558 So.2d 994 (Fla.1990) (explaining that the purpose of the Savings Clause is prevent a defendant from evading punishment).
[54] The resolution of these issues should also serve as an apt reminder that the responsibility of our courts does not end with the mere mechanical processing of cases. We must directly confront the important and sensitive issues that are presented to us. And, of course, there is no greater responsibility assigned to us than to see that the criminal justice process is carried out in accord with the provisions of the Florida and United States Constitutions. It is the exercise of that responsibility that is made visible in the various opinions of the justices of this Court in this case, and it is the diligent exercise of that responsibility that defines the very essence of the role of this Court in the scheme of Florida's constitutional government. We cannot shirk that responsibility because it arises in the context of outrageous criminal conduct involving totally blameless victims. While those extreme circumstances form the backdrop for the issues we confront and may give rise to the most passionate of emotional reactions, it is peculiarly and importantly within the charge of the justice system to be certain that we resolve these important issues without resort to the distorting influences of passion and emotion.
[55] Indeed, it cannot be gainsaid that our justice system is not simply an instrument of vengeance, despite the connotations to that effect contained in the extreme rhetoric that sometimes surrounds the constitutional debate over the continuing use of the electric chair. Unfortunately, the constitutional debate over whether killing a condemned murderer by electrocution constitutes cruel or unusual punishment is recklessly cast by some in terms of a failure of society and the justice system to consider the fate of the innocent victims of the condemned defendant's crimes. That suggestion misperceives the essential role of the justice system, distorts the constitutional debate, and factually misses the mark. Of course, in addition, nothing could be further from reality. The reality is that our society so values human life that we reserve our harshest criminal penalties for violent acts that threaten or take an innocent human life. So, it can hardly be said that the taking of an innocent life is ignored by society or its justice system. But it must never be said that the American justice system has refused to properly confront the issues that it has been given the unique responsibility to decide or, worse yet, that the justice system has allowed itself to become a means for extracting vengeance. We have too often seen the failure of societies whose court systems operate in such ways.
[56] Last year when I joined the Court, I joined with Chief Justice Harding in urging the Legislature to switch to lethal injection. However, our Legislature, while providing for lethal injection if electrocution is declared unconstitutional, has elected to retain electrocution as its sole method of execution. This leaves the Court with no choice but to fulfill our obligation to examine the constitutional question.
[57] See also Furman v. Georgia, 408 U.S. 238, 263-68, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam) (Brennan, J., concurring) (citations omitted):

[The Framers] included in the Bill of Rights a prohibition upon "cruel and unusual punishments" precisely because the legislature would otherwise have had unfettered power to prescribe punishments for crimes....
... Accordingly, the responsibility lies with the courts to make certain that the prohibition of the Clause is enforced....
... The right to be free from of cruel and unusual punishments, like the other guarantees of the Bill of Rights, "may not be submitted to vote; (it) depend(s) on the outcome of no elections." "The very purpose of a Bill of Rights was to withdraw certain subjects from vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."
Judicial enforcement of the Clause, then, cannot be evaded by invoking the obvious truth that legislatures have the power to prescribe punishments for crimes.
[58] In fact, it appears the prime concern of the Legislature was that the death sentences not be invalidated as a result of a change in the method of execution. As Justice Harding's concurring opinion and Justice Shaw's dissent explain, the change to lethal injection would not result in any death sentence being vacated.
[59] In Nebraska, legislation has been proposed that would change the method of execution from electrocution to lethal injection. See LB 52, 96th Leg., 1st Spec. Sess. (Neb.1999).
[60] I agree that the Department of Corrections (DOC) appears to be attempting in good faith to correct recurrent problems that have turned a series of executions over the last few years into something of a freak show. In fact, it is precisely because these problems continue to occur, despite the best efforts of DOC, that the electric chair is not only unconstitutional as applied in Florida, but per se unconstitutional as a cruel and unusual punishment incompatible with evolving standards of decency.
[61] Justice Powell's views in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), were largely adopted by the Supreme Court as the analysis to be used in Eighth Amendment claims in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).